DEMMITT COLE ET AL., APPELLEES, V. LORENZO COLE ET AL., APPELLANTS.

Deed : CONVEYANCE BY ONE OF FEEBLE MIND: UNDUE INFLU-
ENCE. C., a man past 70 years of age, afflicted with senile cer-
ebral atrophy to such an extent that his mind and memory were
so impaired that he often did not know his own sons with whom
he had resided all their lives, would often become lost in his
own house, door-yard, and orchard. Being possessed of a farm
of the value of nearly twenty thousand dollars, and being the

father of thirteen sons and daughters, all mature men and wo-
men, the fruits of three several marriages, his third wife being
dead, and the youngest son ·being married and occupying the
old homestead with C., the father, a claim was presented to C. by
an attorney on behalf of one Mrs. S., a daughter of the last
wife of C. by a former husband, for her share of $1,500, alleged
to have been received by C. of money inherited by his said last wife
from a deceased uncle's estate in the year 1844, and some of the
sons of C., by the said last wife, including the said youngest
of said sons, co-operated with the attorney to effect a settlement
of the claim of Mrs. S., their half sister, as well as the claim
of the six sons and daughters of C. by his said last wife to the
balance of said $1,500.   Whereupon, C. executed and delivered
to the said six sons and  daughters by his said last wife, a deed
of general warranty of and to his said farm (the same being
his entire possessions), reserving to himself a life estate therein
and excepting from the covenant of warranty the claim of Mrs.
S. for no other consideration than the said claims.  In an ac-
tion commenced in the name of C., and which at his death was
revived in the name of his seven sons and daughters by the two
former marriages; *Held*, That the judgment and decree of the
district court, whereby the said deed was vacated, annulled, and
declared of no force or effect, be affirmed.

APPEAL from the district court of Cass county.    Heard
below before POUND, J.

*Allen Beeson* and *Chapman & Polk*, for appellees.

*M. A. Hartigan*, for appellants.

COBB, J.

This action was brought in the district court of Cass
county by Demmitt Cole, plaintiff, against the defendants.
Pending the action in that court, the death of the plaintiff
was suggested and the action revived in the name of Calvin
H. Parmele as administrator, and Lewis F. Cole, William
Cole, John W. Cole, George D. Cole, Frank Cole, Maud
Cole, and Susanah Drake as devisees under the will of the
deceased, whereupon the cause proceeded to trial and judg-
ment.

I copy from the abstract the entire pleadings in the case, together with the statement of the case by defendants' and appellants' counsel, from which the nature and object of he action, as well as the grounds of the defense will appear.

"Demmitt Cole, plaintiff,
          vs.
Lorenzo Cole, James M.
     Cole, Alfonzo M. Cole,   } Petition in Equity.
     Joseph F. Cole, Celes-
     tine Russel and Dianah
     Chalfant, Defendants.

"The plaintiff states that he is, and for more than a year last past has been, the owner in fee simple of the following described real estate, situated in Cass county, state of Nebraska, to-wit: The south-west quarter of section No. twenty-four. The west half of the north-east quarter of section No. twenty-four, and the east half of the south-west quarter of section No. twenty-four, which lies east of a small creek which runs northerly through said section, except three acres heretofore deeded to David Brinson; and the north-west quarter and the west half of the north-east quarter of section No. twenty-five, all in township No. eleven, north of range No. 13, east of the 6th P. M. Also about thirty-two and one-half acres of land, described as follows, to-wit:

"Commencing at a point two and $\frac{20}{100}$ chains south of the witness corner, between sections thirteen and twenty-four, of township eleven north, of range thirteen east of the sixth P. M. (said witness corner being twenty-five links west of the true quarter section corner, thence north 61 degrees 35 minutes, east 11 and $\frac{10}{100}$ chains, to a walnut tree on the south bank of Rock creek, thence following the meanders of said creek westward about ten chains, to a point north 8 degrees 50 minutes, east one chain from a large elm tree, thence south 8 degrees, 50 minutes, west by said elm tree 22 and $\frac{50}{100}$ chains to a stake, then south 62 degrees

15 minutes, east 12 and $\frac{60}{100}$ chains, to an old elm stump on the east bank of a small creek, thence following the meanders of said creek north-easterly to the point of beginning, containing twenty-seven and one-half acres, the same more or less being in said sections 13 and 24. Also the following land, viz: Commencing at the quarter section between section 13 and 24, in township 11 north, of range 13 east of the 6th P. M., thence south twenty chains to the south-east corner of the north-east quarter of the north-west quarter of said section 24, thence west about 4 and $\frac{75}{100}$ chains to the center of a small creek, thence down said creek to the place of beginning, containing five acres more or less, said last two descriptions of land being situated in township 11 north, range 13 east of the 6th principal mer-idian, in Cass county, Nebraska.

"2. That he is seventy-eight years old, a widower, and the defendants, and Lewis F. Cole, John W. Cole, William T. Cole, and Susanah Drake are his children, and only children now living.

"3. That on the 8th day of October, 1881, the defeud-ants, James M. Cole and Alfonzo M. Cole, together with one Michael A. Hartigan, an attorney at law and notary public, came to the home of plaintiff on said land and pro-cured him, by fraud and deception, to sign an instrument of writing, purporting to be a warranty deed of the whole of said lands to these defendants, as grantees, reserving a life estate therein to plaintiff.

"4. That at said time plaintiff was sick and unable to sit up, and in consequence of his age and sickness, his mind was so affected that he did not know what he was doing, and was utterly incapable of transacting any business.

"5. That said defendants, James M. Cole and Alfonzo M. Cole, and the said Michael A. Hartigan, well knew the physicial and mental condition of plaintiff at said time, and that he was utterly incapable of transacting business, and purposely took advantage of his helpless condition to obtain

said deed, and thus to secure to themselves and their co-defendants the whole of plaintiff's property, leaving nothing for his other children.

"6.    That said James M. Cole, and Alfonzo M. Cole, and Michael A. Hartigan procured plaintiff to sign said pretended deed without any knowledge of the character of the instrument whatever, and when his mind was in such a condition that he did not know what he was doing, and said parties refused to tell him what it was or to give him any information in regard to it, but on the other hand carefully concealed from him the nature of the instrument he was signing, and the said Michael A. Hartigan, for the purpose and with the design and intent of assisting, aiding, and abetting the said James M. Cole and Alfonzo M. Cole in perpetrating said fraud upon plaintiff and his other children, falsely and fraudulently certified in his official capacity as a notary public, over his official signature and seal of office on said instrument or pretended deed, that plaintiff personally appeared before him and acknowledged the execution thereof to be his voluntary act, when said Hartigan well knew that plaintiff did not know what he had done.

"7.    That plaintiff never designed, intended, or desired to make such disposition of his land, and does not now wish to make such disposition of it.

"8.    That the said land comprises all the land owned by plaintiff and constitutes his homestead where he has resided for about fourteen years, and that said defendant procured the execution of said pretended deed for the purpose of securing the whole of said land to themselves, and preventing plaintiff's other children from getting any part thereof.

"9.    That there was no consideration ever paid to or received by plaintiff for said pretended deed. Wherefore plaintiff prays that said pretended deed so executed as aforesaid be canceled, set aside, and held for naught, and the defendants

and each of them be barred and estopped from having or claiming any interest in said lands by virtue of said pretended deed, and that plaintiff's title thereto be declared absolute as against the defendants, and that he have judgment for costs, and that he have such other and further relief as may be adjudged equitable."

Signed by plaintiff's attorneys and verified.

After filing the petition, but before answer, the plaintiff, Demmitt Cole, appeared in court (in vacation) and filed his motion or paper writing dismissing the suit as follows:

"And now comes the plaintiff in this action and moves the court to dismiss this action for the reason:

"1. That he now believes said case can be settled without litigation.

"2. That after further and careful consideration he does not wish said cause to be prosecuted longer, and that the allegations in the petition are not true.

"(Signed)        DEMMITT COLE, by his mark.

"Witness, W. C. SHOWALTER."

Defendants afterwards filed their amended answer as follows:

"Come now the defendants, by leave of court first had and obtained, and file this their amended answer, and therein answering say:

"1. They deny each and every allegation in said petition contained and not therein expressly admitted.

"3. They expressly and specifically deny the power of the court to appoint and the power of the pretended administrator to receive the appointment of such trust at the time when the claim of such appointment is made, that there was an attempted will then in existence, with executors named therein, and that said executors had not renounced or surrendered their trust, as by law required, which was then apparent from the records of the probate court of Cass county, and that such appointment was in law and in fact null and void and without force or effect.

"4.   That at the time when the order of revivor was attempted to be made in this court the plaintiff, Susannah Drake, was incapable of commencing or maintaining an action, being legally incompetent from so doing, and confined then and still so confined in a lunatic asylum in the city of Columbus, Ohio.

"5.   They specifically deny all charges of confederation and combination to defraud, charged and alleged against James M. Cole and Alfonzo Cole, with one M. A. Hartigan, as charged in said petition, and allege the truth and facts to be that when said deed was made that said Hartigan then was, and still is, the attorney for one Josephine Scothorne, the half sist  of these defendants, who then and now claims a legal right to the property and estate of their mother, late deceased, and a child's interest therein. And that said Hartigan was called by the defendant's father to make the deed in controversy, and their said father paid for the expense of such deed.

"6.   Defendants further answering say that their father, Demmitt Cole, when said deed was made was competent, mentally and physically, to make the same.   That the making of said deed was in the presence of and in pursuance of an agreement made by their father some months before said deed was made.   That there was time taken by their father to consider and think over the making of said deed.   And that such deed was only made after such consideration and thought, the same being in all things his voluntary, willful act.

"7.   Further answering say that long prior to the making of said deed that their father had often expressed a desire and willingness to convey land to the defendants herein, to requite the claim, 'and if necessary and needful, his then remaining estate' of their mother upon their father, and due and payable to defendants in such right.

"Defendants say that some thirty-five or forty years ago, and at or about the time of their mother's intermarriage

Cole v. Cole.

with their father, she received in her own right, through and from her uncle's estate, a legacy amounting to fifteen hundred (1,500) dollars. That when the same was received their father was in straitened financial circumstances, and that he made and agreed with their mother that if she would bring the money received home and pay off the indebtedness then existing on their home farm she could forever hold and own the property; that she did do so and that said legacy was paid out upon said lands—in pursuance of such agreement and understanding, which would not have been done otherwise. That their father, as defendants believe and charge the truth to be, made a paper writing of and concerning this agreement, and that the same was in the possession of their mother at her death, but as to its present whereabouts these defendants cannot say.

"Defendants say the home in Ohio was sold (being the one purchased by the mother's legacy) and the money invested in the land in suit. And that their father was not able to purchase when he done so without the mother's money. Defendants say their father at various times, years before the deed in controversy was made, and in the lifetime of their mother, had offered to convey portions of the land in suit to defendants' mother and to these defendants, and that the reason the same was not done was owing to a dispute as to the amount to reserve to the father for his life estate and support.

"Defendants show unto the court that they are the children of their father by a third marriage; that the first and second wives each had an estate in their own right, and that upon their death the same was promptly paid, taken and received by their children—the plaintiffs herein—and that in addition thereto their father made gifts, advancements and otherwise aided and assisted plaintiffs during his lifetime.

"Defendants say that the growth of said lands in value

and not their original cost that has made their present value. And that their original cost was not equal to the consideration mentioned in the deed made by their father to these defendants.

"The making, execution, and acknowledgment of said deed being herein admitted, and the same being based upon the condition (with the love and affection borne by the father) hereinbefore named and stated in this answer.

"That in consideration of the obligation resting on their father to their late mother said deed was made to these defendants, and creating and acknowledging the rights of their half-sister, Josephine Scothorne, who claims with and through their late mother, deceased, and who is a needful and necessary party to this action, without whom this cause cannot be fully and fairly heard and the rights of defendants determined. That in making said deed their father secured to himself a life estate in said lands, claiming at the time that was all the interest he sought or needed therein. That these defendants have in no way sought any interference with the care, custody, and management of said lands during his lifetime.

"Defendants deny all purpose or intention to in any manner commit any fraud against the other or older children of their father by prior marriage, and charge the truth to be said children at all times when they came of age took the property of their mothers with other aid and advancements made them by their father. That they received large sums of money and other advances made to them from time to time, much of which was made from the property and earnings of their (defendant's) mother.

"That said older children, particularly Lewis and William, with a fraudulent and dishonest purpose to obtain the property of these defendants through and under their mother, took their father and attempted to have him make a will, and therein and thereby exclude and disinherit these defendants. That said will was not made by their father,

but a will was made for their father in which he wholly forgot and overlooked the defendant, Lorenzo Cole.

"Defendants further show unto this court that this suit was commenced without the knowledge, consent, or direction of their said father in his lifetime; that when he learned of the pendency of said action he promptly and of his own will and accord appeared in the district court of Cass county, and therein dismissed the same, as the same appears in the records of this honorable court, and therein and thereby ratified and confirmed his deed and the making of the same.'

"In consideration of the premises, defendants ask that this action as to Calvin H. Parmele and Susannah Drake abate, and as to Josephine Scothorne that said action abate she being a needful and necessary party to the determination of said cause. That as to all the several and other plaintiffs, this action be dismissed, and defendants be allowed their costs and disbursements, with such other relief as equity may direct."

Signed by defendant's solicitor and verified.

Reply to amended answer:

"Comes now the plaintiff in the above cause, and for reply to the amended answer of the defendants:

"1. Deny each and every allegation therein contained that is inconsistent with the allegations in plaintiffs' petition.

"2. Plaintiffs further say that on the 20th day of January, 1882, when the motion to dismiss the action was filed, as stated in the amended answer of defendants, the said Demmitt Cole, owing to his great age, and to disease of mind and body, from which he was then and had been for a long time suffering, did not know, and was not capable of knowing, what he was doing. That he did not understand, and was not capable of understanding, the nature and effect of said motion. That what he did at that time was done by the direction and advisal of the defendants,

or some of them, and not of his own will.    That prior to that time an application had been filed in this court to have a suitable person appointed to conduct this suit on behalf of the plaintiff, on the ground that plaintiff's mind was so affected that he was not capable of attending to business. That said motion to dismiss was afterwards considered by this court and overruled, and the cause ordered to proceed in the name of the guardian of the plaintiff."

Signed by plaintiff's attorneys and verified.

Statement attached to the abstract by defendant's solicitor:

"The plaintiff, Demmitt Cole, in whose name the suit was first commenced, was three times married.    There was children born in each marriage—Lewis and Shadrack by the first.    Lewis is still alive, and one of the plaintiffs as the suit stands revived.    William T. Cole, John Cole, and Susannah Drake are children of the second marriage, and Lorenzo, James, Alphonzo, and Joseph Cole, with Celestine Russell, and Dianah Chalfant, are children of the third marriage, all living, and defendants in the case.    Josephine Scothorne was a child of the last wife by a former marriage, before her marriage with Demmitt Cole, so that the record shows the two older sets of children arrayed against the younger ones and their half sister (Mrs. Scothorne), although Mrs. Scothorne is not made a party to the suit.

"The contest grows out of the effort to obtain by the younger children the money the mother brought into the family as her own exclusive property.    It appears from the record that there is no dispute as to the receipt and application of this money ($1,500), by Demmitt Cole, in the state of Ohio, to the discharge of the purchase indebtedness of the Ohio farm, which was afterwards sold and the money invested in Nebraska.    That to pay off his claim to the younger children and their half-sister the deed in question was made, and to set aside and cancel that deed this suit is brought."

There was a trial to the court, with a finding and judgment for the plaintiffs. And the defendants bring the cause to this court by appeal, and assign the following errors:

"1st. The court erred in retaining said cause in court after the motion of plaintiff Demmitt Cole dismissing the same.

" 2d. The court erred in permitting the suit to be maintained and judgment recovered in favor of the present plaintiffs without proof of their succession to the subject of the suit.

"3d. That the court erred in setting the deed wholly aside, but should have permitted it to stand to the extent of defendants' interest therein, or the money actually due the mother of defendants.

"4th. That the court erred in not declaring a trust in said deed for defendants in the right of their mother, to the extent of his estate and interest therein.

" 5th. The court erred in not making the claimant, Mrs. Scothorne, a party defendant.

" 6th. That the finding (which was general) is not sustained by the evidence; nor is said cause, from the evidence, brought within the limits of equitable relief.

"7th. That the court should not have set aside said deed, but should have made the plaintiffs and defendants distributees under the deed, if plaintiffs were entitled to any relief.

" 8th. That said decree should have been for defendants."

I find it impossible, as the case is presented, to understand upon what the first of the above assignments of errors is based. The abstract contains a copy of a motion filed in the district court in vacation by the plaintiff Demmitt Cole to dismiss the action; but I am unable to find, either in the abstract or the record itself, that the attention of the court was called to it or any ruling had thereon. Under the provisions of the statutes, the plaintiff, Demmitt Cole,

could have dismissed the action at the date of said motion by simply entering an order of dismissal upon the docket, or filing it with the clerk. Such being the daily practice, and he not availing himself of it, would seem to indicate that he did not desire to dismiss the case. What he did do could amount to nothing at all until he or his counsel should call it up in open court and obtain a ruling or order of the court upon it. So far as appears, it never was acted upon, and accordingly no error can be predicated upon it.

The second error assigned seems to be based upon the idea that the present plaintiffs, other than Parmlee, could not prosecute the suit, or be known in it as plaintiffs in their character of heirs-at-law of Demmitt Cole deceased. As a strict matter of law it is probably true that an administrator and the heirs of the deceased cannot join as parties to the same action, it being of the character and for the purpose of the case at bar; but the reason is because the presence of such administrator as a party in such a case is unnecessary; and there can be no doubt of the right of plaintiffs Coles and Mrs. Drake to prosecute the action in the character of heirs, co-heirs at law with the defendants (other than Mr. Hartigan) of Demmitt Cole, deceased. The object of the suit was to clear off an alleged cloud upon the title to the lands left by the deceased at his death, and it was proper and probably necessary that all the heirs-at-law should be made parties, but it was not necessary that all should be plaintiffs. That the plaintiffs, with the exception above named, are heirs-at-law of the original plaintiff, and lawful distributees of any of his estate of which he died intestate, is apparent from the evidence. The third, fourth, sixth, seventh, and eighth errors will be considered together in passing upon the evidence.

Defendants assign as their fifth point of error that the court erred in not making the claimant, Mrs. Scothorne, a party defendant. There is nothing either in the abstract

or record itself upon which this assignment can be said to be properly based. So far as appears she never applied to the court to be made a party, and without such application the court had no power to make any order affecting her or her rights in any manner whatever. But courts are always inclined to allow any applicant who can show an interest in the subject-matter of a litigation to be made a party defendant to a suit. I cannot see how the person referred to could possibly have made a showing of any interest whatever in the litigation involved in the case at bar. From what was said by counsel at the hearing, and from the copy of the deed set out in the bill of exceptions, it appears that the name of Mrs. Scothorne appears in the deed to set aside which this action was brought, but not as a grantee, nor in any way to create a right in her other than a possible estoppel against the defendants.

The other assignments fairly present the question whether the finding and judgment of the court are sustained by the evidence and the law applicable to the case.

The evidence is so voluminous that neither time or space will admit of more than a very brief resumé of it here, nor indeed is it necessary to a proper disposition of the case. There are some undisputed facts in the case which may be stated as follows: Demmitt Cole was one of the oldest settlers of Cass county. In the year 1881 he was seventy or more years of age, a widower, his last wife having died some eight or ten years previous. He had nine sons, all adults, settled men, residing in this state, and four daughters, all adults, and three of them married. He was the owner of a farm consisting of a section of land, all well improved and under cultivation. One of the sons, Joseph, was living with his family in the principal dwelling house on said farm, and his father, Demmitt Cole, was, and had been for several years, living with him as a member of his family. On the day above stated, Demmitt Cole executed and delivered a deed of his said farm, being all of his real

7

estate, to six of his sons and daughters, reserving in himself a life-estate in and to the whole of said farm. The consideration named in said deed is set out therein in the following words : "In consideration of the sum of four thousand dollars, and in consideration of the money due the grantees from their mother's estate in hand paid." The deed also contains a covenant of warranty of seizin against incumbrances, and also to warrant and defend the title to said premises against the lawful claims of all persons whomsoever, "except the claim of Josephine Scothorne through her mother, my late wife, deceased, which they shall pay and discharge, the same being considered a lien on the lands herein described." There was no consideration paid or passed for the land or the conveyance thereof at the time of the execution and delivery of the deed. It may also be said that they are undisputed facts, that the grantees named in said deed are the issue of said Demmitt Cole and his third and last wife, that the plaintiffs are issue of him and his first and second wives respectively, and that the said Josephine Scothorne, named in the said deed, is the daughter of the last wife of said Demmitt Cole by a former husband. There was evidence which tended to prove and is uncontradicted, that said Josephine Scothorne resided in the state of Kansas, and is the only surviving child of her mother, other than the defendants Coles. That after the intermarriage of Demmitt Cole with his said last wife, and about the year 1844, she succeeded to an estate of $1,500, which Demmitt Cole used in paying for a farm which he purchased and occupied with his family in the state of Ohio, and which farm he sold for cash previous to his emigrating to Nebraska Territory some ten or eleven years later. Defendants claim, and it may probably be conceded, that the said $1,500, or a part of it, the estate of the late Mrs. Cole, is traceable and traced into the purchase by Demmitt Cole of the section of land in Cass county which forms the basis of this controversy. There was also evidence that

Mrs. Josephine Scothorne claimed from Demmitt Cole the payment of her share of the said $1,500, as one of the heirs of her deceased mother, and that by correspondence, through an attorney of Paola, Kansas, she placed the said claim in the hands of the defendant M. A. Hartigan, an attorney-at-law, for collection. That shortly after receiving said claim, Mr. Hartigan, through two of the sons, one a plaintiff and one a defendant in this action, procured an interview with Demmitt Cole at the office of the attorney in Plattsmouth. That in said interview Demmitt Cole admitted the facts, or a part of them, upon which the said claim was founded, at least to some extent recognized the claim of the said Mrs. Scothorne, and expressed a regret that the same had not been settled during the lifetime of his deceased wife. He, however, said that he would let the matter rest and fix upon some manner or course of settlement. In this conversation he probably referred to the claim of the defendants, to their distributive shares of the said money, as well as the claim of Mrs. Scothorne, although it does not appear that the said attorney represented any of them. It appears that D. C. afterwards visited the office of said attorney and had further conversation with him, in which he said that he had sent for his son Lorenzo, one of the defendants, who reside in another county. The amount of the claim of Mrs. S., together with those of the defendants, was then figured up by said attorney at the request of D. C., and it was understood between them that upon the arrival of Lorenzo, the whole matter would be fixed up and settled. It further appears that afterward, and during the absence of the said attorney from his office and the state, the said Demmitt Cole, together with the said Lorenzo, and probably all of the male defendants, visited the office of said attorney, presumably for the purpose of carrying out his expressed intention of settling the said business, but the attorney being absent nothing was done, and they went away.

Some time afterwards, and after the return of said attorney, he was requested by James Cole, one of the defendants, to come out to the farm where the said D. C. was residing, and informed that they had agreed upon a settlement. This was a few days prior to the 8th day of October, 1881, and on that day Mr. Hartigan went to the house of Joseph Cole on the said farm, and that then and there, in the apparent consummation of the purpose theretofore talked about between the said Demmett Cole and the said attorney, the deed hereinbefore referred to was drawn up by the attorney and signed and acknowledged; also delivered to the attorney for the parties interested.

As tending to show what occurred at the time and place of the execution and delivery of said deed, I copy from the abstract the testimony of James M. Cole, one of the defendants, given on his examination in chief on the part of the defendants.

Q. What relation, if any, did you bear to Demmitt Cole in his lifetime?

A. Son.

Q. By what marriage?

A. The last marriage.

Q. I will ask you if you were present and heard the conversation, and if so, state what was said between your father and Lorenzo Cole when he came down here in 1881?

Beeson: You are one of the defendants and one of the parties named in the deed?

A. Yes.

Beeson: I object that this witness is incompetent under the statutes to testify; he has a direct legal interest in the result of the suit, and the adverse party is an administrator.

Overruled and exception.

A. I was present and heard the conversation.

Q. What was said that morning?

A. Father had summoned my brother Lorenzo from

Cole v. Cole.

Butler county to come down, and he told him in the evening that he wanted him to come over in the morning, that he wanted all us boys there. I went over, and as I went over, my brother Lorenzo was standing on the porch. Father was standing out in front. We all spoke and talked a little about the weather and how he felt. Well, my brother Lorenzo says to him that he was in a hurry to get back home, and what we are going to do about this affair let us be doing. We walked around to the east side of the porch and sat down. And father spoke up. "Now," he says, "boys, you know as well as I do, that I have not got the money to pay off this claim," and he said, "I will deed the land to satisfy that claim if that is satisfactory to you. I want to hear from you all." Lorenzo spoke first: "Father, you can have mine," says he. Says he, "If I do this it will put me on the mercy of the world," and the tears came in his eyes. Lors says, "You can have the use of mine as long as you live, and if it takes it to your support you can have, you will have it." He turned to me and asked me how that was, and I told him I was satisfied. He turned to everyone: "And now, says he, "we will go down."

Q. What did you do after that?

. A. We got into the wagon and came down and went to Hartigan's office; found him not there. We asked Mr. Donohue where Mr. Hartigan was, and he said gone to Clarinda, Iowa. Then Lorenzo said he could not stay longer and he must go back. He pressed him about it and he said, "Lors, I would rather you would be here." Lors said, "You can settle it; whatever is satisfactory to you do. You agree to do whatever is satisfactory to him, and whatever you agree it is satisfactory." And with that understanding with us my brother Lorenzo went home. Well, we all went home, and it was about, I expect, two weeks I met Mr. Hartigan at the post-office door. That was the first I had seen of him since. Well, I went home, and as I went home father was standing out at the bars

that cuts through the yard over to where I·live, and he asked me if I had heard from Lorenzo since he went home, and I said "No." And then he said, "Have you seen Mr. Hartigan?" and I said I had, and he said he was willing to settle it at any time he wanted to come up. That was all that was said at that time, and it was over a week, and possibly two weeks, that I mentioned it to my father. And as he was old and could not stand it to ride in the wagon, he said, "Tell Hartigan," inasmuch as I went there, "you tell him to come down and fix the deed here." He said, "It worries me to ride in the wagon; am getting stiff in the joints and cannot get in and out." I said, "All right, I will tell him any time you want him to come." He said, "Now." I went and saw Hartigan again and told him to come. That was the first of the week, I think, and he did not come until the last of the week. When I went home father asked me if I saw him. Said he, "Said he would be down some time this week, Friday or Saturday; did not think he could be down before that, as he had some cases in the county court, I think." Nothing was said until Hartigan came, which was Saturday, I think; he came out to where I was mowing a little piece of grass. "Now," he said, "I want you to come along with me." I said, "All right," and unhitched the team and went with him. When we started to go over to father's house I don't know whether we met Alphonzo over there at his house or on the road, but anyway he turned and went with us. When we got to the house father was standing at the door, and he spoke to us and said, "Take chairs." We sat down and talked a few words. And the subject was raised then, but who raised it I don't remember, or just the words it was raised on. "Well," he says, "I would rather that Lorenzo was here." We told him, Phonz and I, "Didn't Lorenzo say whatever we would do would be satisfactory?" "Yes," says he, but he would rather he would

be here. "Well," he says, "I want it fixed, and I want it done according to law." "Well," says Mr. Hartigan, "that is the way we propose to do it." Agreed to settle it; and then Mr. Hartigan asked about feeding the horse, and we went out to feed and tie the horse, and Joe Cole's wife came to the door and called to him and said that grandpa wanted him to put the horse in the barn and feed it and come in for dinner, and after dinner he would see him. We did that. I went home and took my team and fed it. When I came back Mr. Hartigan was sitting at the table and my father at his left hand. My father had the deed in his hand in this position, and they were talking over about Josephine Scothorne, and father says, "She may come in to-morrow and call for a division of the land, and I don't want to have it divided," and I told him no, she would not. I said, "If that is satisfactory to you here, you have got the deed, and I will take Josephine Scothorne off your shoulders, if that is agreeable to Hartigan." We had a few words in regard to it and he agreed to it. Before it was signed, he said, "Mr. Cole, you understand the facts." He said, "I do." He said, "I am going to read it very carefully, and want you to notice; if there is any change I want you to make it." He says, "There is no change." "Then," says he, "you are ready to sign it." He said, "I am." Hartigan got off the chair and father took the pen and signed it. I sat by and saw him write the deed. Then he pulled out his pocket-book and wanted to pay Hartigan, and just what the consideration was I don't know. Don't know just what was said, whether it was three dollars, two dollars, or two dollars and a half, or a dollar and a half. Father says, "I want you to fix that deed," and handed it to him. "I want you to take that and put it on record." "Very good," says Hartigan, "I will see to it." I went home and saw nothing more of it, knew nothing more of it, until I got the summons in January, I think.

Q.   I will ask you if you stayed to dinner at Joseph's house?

A.   I did not.

Q.   I will ask you to state to the court whether this conversation was brought up that was had between your father and Lorenzo and you boys there before the making of that deed?

A.   Yes, it was between four and six weeks.

Q.   Before it was made, if you remember whether this conversation was brought up about the making of the deed, conversation between your father and Lorenzo, agreement as to the deed?

Court : At the time the deed was made, if there was any mention made of the prior conversation when Lorenzo was there? ·

A.   Not that I remember of.

Q..   I will ask you if the question of the claim of your mother against your father and what—

Witness : When the deed was made?

Q.   Yes.

A.   Yes.

Q.   I will ask you to state at that time if conversation was not brought about in regard to settlement had between you boys and your father at the time Lorenzo was here?

A.   Yes.

Q.   I will ask you to state to the court what your father said, if anything, there in regard to what this money was applied to?

A.   He said it was applied to the old home-place in Ohio, and he regretted that we had not settled it in mother's lifetime.   That is my recollection. ·

Q.   You were acquainted with your father's habits of mind and everything of that kind?

A.   I have almost all the days of my life. `

Q.   How did that mind compare at the time Lorenzo was here and had that conversation, and also at the time

the deed was made in comparison with his mental condition before that time?

A.   Could not see any difference at all.

There was much additional evidence tending to prove that the apparent object and purpose of these negotiations on the part of the defendants—the Coles—was to assist the defendant, Hartigan, in his efforts to secure the claim of Mrs. Scothorne, yet that their real and principal object was to secure for themselves the payment of their claim for their share of the money, which, as was claimed, their father had received belonging to their mother, as hereinbefore stated.   And that the sole object and purpose of the defendant, Hartigan, was to secure and collect the share and claim of his client, Mrs. Scothorne.

The consideration then for the execution of the said deed was the money received by Demmitt Cole in 1844 or '5, the property of the mother of the grantees.   This money, calling the amount fifteen hundred dollars, the largest fixed by any one, with interest at the rate of seven per cent per annum, would then have amounted to somewhat less than five thousand five hundred dollars.   . The land at the date of the conveyance was worth, according to the testimony of Lewis Cole, and which I believe was uncontradicted, from sixteen thousand one hundred to nineteen thousand three hundred and twenty dollars. .  Mere inadequacy of consideration would not be sufficient to avoid the deed, yet it may and should be considered in connection with other facts.

A portion of the brief of appellants is devoted to the argument of, and the citation of authorities to, the proposition that the fifteen hundred dollars received as hereinbefore stated by Demmitt Cole, the property of his wife, was held in trust by him; that when he paid it out in part payment for a farm purchased by him in Ohio, he held the farm partly in trust for his wife; that when he sold that farm and emigrating to Nebraska Territory, accumulated

the farm in question, the said trust passed into it, and that the execution of the deed under consideration was the execution or discharge of the said trust. The only fault which I care to find with this proposition is, that the essential facts necessary to its establishment are not proved in the case. There are facts alleged in the answer which if proved would go far to establish such trust, but I fail to find any proof of them in the abstract.

I now come to the consideration of the question, whether at the time of the execution of the deed in question, Demmitt Cole, named as the grantor therein, was possessed of the mental capacity and will power necessary to constitute it *his deed*. The most part of the voluminous record is directed to this point. I here copy the substantial part of the testimony in chief of the two medical witnesses introduced on the part of the plaintiffs.

Deposition of Dr. H. Meade:

"Reside at Ogden, Utah. I practice medicine and surgery; been so engaged somewhere about nine years. I am a graduate of Dartmouth and Hahnneman, of Chicago. I practiced medicine in Plattsmounth. I would not be positive about the time that I came here, whether in the spring of 1880 or 1881, and left in 'January, 1884. I was acquainted with Demmitt Cole; treated him as a physician in October, 1881. Saw him on the evening of the 8th of October. He was lying on the lounge in, I believe, what they call the sitting room. Kind of a lounge bed, or something that he had seemed to favor as a bed. I don't remember exactly what his condition was. Know his bowels were irregular, and he felt in a general malarious condition. Made record of it—at that time when I questioned him I placed no reliance on his answers at all—I depended upon observations and what Mrs. Joseph Cole told me as to his condition. From his condition and appearance, I considered that it was unsafe; that I would not get at the truth if I did. I considered that he was suffering from what we

call 'senile cerebral atrophy.' A cerebral atrophy is a disease of the brain itself. It causes diminished power, both physical and mental—loss of memory. I guess that is about the the condition of it. But I was not treating him for the cerebral atrophy at that time—that we do not treat for— I treated him for the minor complaint which arose in the meantime. I did not test his reasoning powers at all, only as far as the questions that I asked him, that he did not answer correctly always. I did not feel like relying upon them, and should not. I do not know his age. He was an old man. The question would indicate mental aberration which would be consistent to which we would expect in senile cerebral atrophy. A person so afflicted would not be competent to transact business, on account of the changed condition of the brain, that they are unable to reason properly. The disease may come gradually, that is the senile cerebral atrophy may arise at any time, and may arise suddenly. The word senile means old, and it is atrophy of old people, old age. I did not see him up, and I don't remember how long he had been in bed; but in the afternoon I might. Just about noon, just after dinner, I met Joe Cole, on my way to the fair ground, or from the fair ground, I am not positive which, and he asked me to go and see his father. I asked him if there was any great hurry. He said no. Then I told him I would be down that afternoon or evening. I think I was there between seven and eight. If I am not mistaken I left here about six—possibly I may have left here at five. I had seen him before. I would not be positive whether I had prescribed for him before or not—saw indications of this disease before that time, I cannot say just when. I was there to see Mrs. Cole several times, and while there I saw him, and came to the conclusion that he was suffering from this senile cerebral atrophy, from his actions, general appearance—felt quite certain, quite positive—saw him more than once before; could not say, but three or four times at least. It

had been within a year. The first time I saw him I paid but little attention to it; as I saw him oftener I took more notice of it. I saw him at the homestead where Joseph Cole lived. He lived with Joseph. Joseph was his son. I think I saw him on the 8th of October at Joseph's. If I was there I saw him, and noticed the same thing. I don't remember just what I noticed each time, except the first time. I might have noticed it, but every time after this I have seen him at Joseph Cole's place, I am positive. The last time I noticed more than ever. It was some time after October 8th, the last time was in the spring of 1883, at Joseph's house. The last I remember of seeing him was then; it was very marked then. It had progressed sufficiently. I cannot say to what extent, but that it impaired it sufficiently that day to unfit him for the transaction of business, at least I should not want him to transact any for me in his condition.

"I should say that on the 8th of October he could not understand the relation of things to each other—most decidedly no. When there on that day he could not give intelligible answers to the questions that I asked him regarding his condition. I asked him but a few questions, and those I merely put to pacify his mind, and every question I asked him I turned to Mrs. Joseph Cole for her answer, and the question as to his bowels I remember most distinctly that she gave different answers to what he gave. That he had given a wrong statement of his bowels as to the action. It is one of those progressive diseases in which we expect no lucid intervals. The brain is diseased. Part of the brain has become absorbed, as it were, consequently there can be no time at which they are entirely free from the disease, and could be perfectly rational. Could not say how long the disease was coming on him. It had been some little time—oh, yes, in October, some months.

"I remember the date, because Miss Barker, that afterwards became my wife, came to town. I learned of it

after I had come to town from the fair. It was the last day of the fair. It was Saturday night, and she came from the country that afternoon. I learned of it, and called to see her on the way out. After my return I made arrangements with Captain Marshall, rented some rooms of him, and the Tuesday following we married—from this, I remember it."

Dr. Scheldnecht sworn and examined:

"Am a practicing physician; about 26 years in Nebraska and Indiana—in Nebraska ever since 1861; was acquainted with Demmitt Cole in his lifetime; was his physician at times; think I was in fall of 1881; prescribed for him occasionally; have not got it down; and when I was not calling there, and called in my office for medicine; cannot remember whether I was called down in the year 1881 or not; yes, sir, he was an old gentleman; quite feeble, sir; quite feeble during the fall and summer of 1881; don't think I could tell exactly; I saw him during that time; I very frequently would see him when I called to see some of the family at Mr. Joe Cole's; well, I don't think he was hardly capable of doing business; he seemed to have an affection of the brain—nervous atrophy, senile atrophy; I think from what I could learn it came on very gradually; quite a little while he was in that way in 1881, and from that on ever since I have known him; he very frequently would commence talking; then he would get through and forget what we were talking about, or quit and talk about something else; very frequently when I saw him at his place he did not seem to know me; I would tell him who I was and then he seemed to know, but not before; had known him ever since he has been in the state; when I first knew him he was a man of sound mind, I should judge; I presume so; he was one of our county commissioners."

I also copy the testimony of Joseph Cole, one of the defendants, called as a witness on the part of the plaintiffs. It was with him that Demmitt Cole resided at the time of the execution of the deed.

"Am a son of Demmitt Cole; age 29 years; am the youngest child in the family; mother has been dead nine years next April; father is dead a little over a year; father lived with me after mother's death; his health—he was not well on the eighth of October, 1881; he was in bed part of the time and up part of the time; he was taking medicines; went to Dr. Scheldnecht and got medicines for him, and took him; I sent Dr. Meade myself; met Mr. Hartigan when I was coming up; he was going down then to see father—to see what he could [do] for the folks in Missouri; did not know he was going for a deed; it was dark when I got home; met Dr. Meade as he was coming away; Hartigan had left; father's age was somewhere in seventy—was over seventy when he died; died year ago this month; he would get up and start away from home—said he wanted to go home, every day or two; he would do that—get lost around the place; he would start off in the house and go in directions, sometimes he would go across the fields, and at other times in the woods north of house; don't think he would be able to get home alone; have seen him when he did not know me, and I have seen him when he would not know other parties; he said he knew their faces, but did not know who they were; could not place their names; I don't [know] how often; several times; a great many times; don't know who this would happen to; some times one and some times the other; don't know hardly; every few days; now and then he would be bad whenever any one of them would come home; I don't know as I ever saw him fail to recognize my wife; he might have done; can't say how he was on the Saturday; I left him in the morning and fetched a load of corn up town and sent a doctor down there; he was not out of bed after I got home [that evening]; asked him how he felt; he was bad off, and gave him some medicine; he talked to me about making the deed; did not seem to understand it alto- gether; did not see how it would benefit him was about all

he ever said to me. [About this suit] I don't hardly know; he said he did not want it, and wanted to stop it some way if he could. Yes, he said he did not want to sue any of his children; wanted to stop it if he could; I think Mrs. Cathey was there the day before; on the next Sunday Will and his folks came down; and Mrs. Chalfant and her husband; don't remember that Lew was there; part of the time during Sunday he was in bed, and part of the time he was not; I don't know that there was anything more peculiar that day than he had been before; I was right there with him all the time; I did not notice anything particular."

There was a vast amount of other evidence tending to prove that at the date of the deed Demmitt Cole was beyond seventy years of age, sickly and feeble in body and in mind, far away on the retreat into second childhood. I think it is sufficiently proven that his mind and memory were so far impaired as to render him incapable of giving that mental and intelligent assent to the execution of the deed under consideration, which the law regards as the essence of all contracts. I choose to place this opinion chiefly on the ground of the absence of a mind on the part of the grantor capable of an intelligent assent to the deed, rather than on the ground of fraud or undue influence on the part of the defendants. Indeed, of actual fraud or fraudulent intent on the part of the defendants, or any of them, there is no evidence. And yet the concerted action on the part of the defendants, apparently for the purpose, on the part of the defendants, other than Mr. Hartigan, and really on his part, to secure and collect the alleged claim of Mrs. Scothorne, but really on the part of the defendants, the Coles, to obtain the title to the entire farm for the doubtful and stale claim of their deceased mother; a claim, even if never so well founded and established, amounting to less than one-third of the value of the farm, would probably, upon equitable principles, and in the light of

many reported cases, be held to be constructively fraudulent, and that the deed thus obtained was obtained through undue influence.

Counsel for defendants takes the position, as I understand him, that by the execution of the said deed, as well as by the admissions made by the said Demmitt Cole, as to the receipt by him of funds belonging to his last wife, etc., he not only admitted the moral and legal obligation resting upon him to account for the same to her children, but waived all defenses, especially that of the lapse of time, which he might otherwise have made. And that the moral and legal obligation thus resting upon him to pay the defendants the amount so admitted to be then due, and having placed in their hands the only fund which he possessed for the purpose of such payment, a court of equity will not scrutinize or weigh the mental power which he possessed at the time of making such disposition, but will regard the act as justified by the motive, however weak the mental power which dictated it. This position is worthy of a respectful consideration, and has the support of many well-considered cases, or would have if the facts in evidence were in all respects as claimed. But neither were the admissions of Cole of the justice of the claim of the defendants sufficiently explicit, nor his mental condition at the time of making them such as to justify the application of the equitable principle contended for. While the evidence is not as satisfactory as could be wished as to the point of time at which the mental faculties of Cole became totally impaired, yet the evidence tends to locate it at a time anterior to that of his conversations with and admissions to Mr. Hartigan as testified to by him. And so the district court was justified in holding him incapable of binding himself by such admissions, or of laying the legal foundation for the deed by such admissions, on the same principles upon which it held him incapable of binding himself or his property by the execution of the deed. With both of which holdings,

after mature consideration, I find myself compelled to agree.

The judgment of the district court is therefore affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.