AARON C. LODER ET AL., APPELLEES, V. SAMUEL H. LODER ET AL., APPELLANTS.

[FILED JUNE 11, 1892.]

1. **Deeds:** UNDUE INFLUENCE. In an action to set aside a deed made by a father in his dotage to his youngest son, *held,* that the testimony tended to show undue influence on the part of the son, and that the father was not in a mental condition to transact important business.

2. **Review.** The judgment is supported by the weight of evidence and is affirmed.

APPEAL from the district court for Cass county. Heard below before CHAPMAN, J.

*T. B. Wilson,* and *J. B. Strode,* for appellants, cited, as to capacity of grantor: *Campbell v. Campbell,* 2 N. W. Rep. [Ia.], 541; *Sloan v. Maxwell,* 2 Green's Ch. [N. J.], 563; *Burt v. Quisenberry,* 24 N. E. Rep. [Ill.], 622; *Van Alst v. Hunter,* 2 Johns. Ch. [N. Y.], 148; *Graham v. Castor,* 55 Ind., 559; *Thompson v. Kyner,* 65 Pa. St., 368; *Mulloy v. Ingalls,* 4 Neb., 115; *Franklin v. Kelley,* 2 Id., 117; *Eaton v. Eaton,* 37 N. J. L., 113; *Lindsey v. Lindsey,* 50 Ill., 79; *Stone v. Wilbern,* 83 Id., 108; *Marmon v. Marmon,* 47 Ia., 121; *Howe v. Howe,* 99 Mass., 88; *Tipton v. Ross,* 10 O., 274; *Coleman v. Roberts,* 17 Ala., 84; *Green v. Green,* 9 Gratt. [W. Va.], 332. As to undue influence: Wait, Fraud. Con., sec. 6; Devlin, Deeds, sec. 84, and cases. As to delivery of deed: *Newlon v. Bealer,* 41 Ia., 334; *McGrath v. Hyde,* 21 Pac. Rep. [Cal.], 948; *Brittain v. Work,* 13 Neb., 351; *Cooper v. Jackson,* 4 Wis., 538; *Mitchell v. Ryan,* 3 O. St., 377; *Tobin v. Bass,* 85 Mo., 654; *Gupton v. Gupton,* 47 Id., 44; *Twiss v. George,* 33 Mich., 253; *Sutton v. Hayden,* 62 Mo., 102; *Hiatt v. Williams,* 72 Id., 214; *Reed v. Douthit,* 62 Ill., 352;

*Bunn v. Winthorp*, 1 Johns. Ch. [N. Y.], 329; *Cline v. Jones*, 111 Ill., 563.    As to laches of plaintiff: *Eaton v. Eaton*, 37 N. J. L., 108; *Trader v. Jarvis*, 23 W. Va., 100; *Pusey v. Gardner*, 21 Id., 480; *Jenkins v. Pye*, 12 Pet. [U. S.], 241; *Gatling v. Lane*, 17 Neb., 77.    Additional authorities: *Dietz v. Farish*, 53 How. Pr. [N. Y.], 224; *Davison v. Davison*, 13 N. J. Eq., 246; *Rhodes v. Rhodes*, 3 Sanf. Ch. [N. Y.], 305; *Scrugham v. Woods*, 30 Am. Dec. [N. Y.], 75; *Fulton v. Fulton*, 48 Barb. [N. Y.], 591; *Snider v. Lackenour*, 38 Am. Dec. [N. Car ], 685.

*Beeson & Root*, contra, cited, as to capacity of grantor: *Emery v. Hoyt*, 46 Ill., 260; *Wheelan v. Wheelan*, 3 Cow. [N. Y.], 538; *Brice v. Brice*, 5 Barb. [N. Y.], 533.    Delivery of deed: *Patrick v. McCormick*, 10 Neb., 5; *Williams v. Schatz*, 42 O. St., 50; *Davis v. Williams*, 57 Miss., 843; *Jackson v. Leek*, 12 Wend. [N. Y.], 107; *Weber v. Christen*, 121 Ill., 91; *Berry v. Anderson*, 22 Ind., 36; *Baker v. Haskell*, 93 Am. Dec. [N. H.], 455.

MAXWELL, CH. J.

This is an action to cancel a deed.    The plaintiffs allege in their petition that they and the defendants are the children and only heirs at law of William Loder, deceased, who died intestate on or about the 14th day of May, 1887, in Cass county, Nebraska, leaving no widow surviving him.

"Second—That on or about the 26th day of March, 1864, the said William Loder, deceased, became the owner in fee-simple of the following described real estate, in Cass county, Nebraska, to-wit: The southwest quarter of section 15, in township 12, range 9, and made his home thereon, where he resided until his death.

"Third—That on the 25th day of May, 1878, the defendant Samuel H. Loder procured the said William Loder

to execute and deliver to said Samuel H. Loder a deed of conveyance of said lands, thereby vesting the apparent legal title to said lands in the said Samuel H. Loder, who caused the same to be recorded in the office of the county clerk of said county.

"Fourth—That at the time said deed was executed, and for a long time prior and subsequent thereto, the said William Loder was, owing to disease of the head and old age, being then about seventy-five years of age, of unsound mind to such extent as to be wholly incapable of transacting business, and never knew to the day of his death that he had made such deed, but always thought he still owned said land and retained possession and control thereof till his death.

"Fifth—That the said Samuel H. Loder was the youngest son of said William Loder, and lived with his father until his death.

"Sixth—That said Samuel H. Loder paid no consideration whatever for said deed, but, well knowing his father's condition, that he was not capable of transacting or of comprehending the nature and effect of signing said deed, and with the intention of cheating and defrauding his brothers and sisters out of their share of their father's property, and taking advantage of his close and intimate relations with his said father, procured him to execute and deliver said deed without the knowledge of his brothers and sisters, and immediately placed the same on record.

"Seventh—That said William Loder was possessed of a large amount of personal property, to-wit, about $4,000; all of which the said Samuel H. Loder, by taking advantage of his said father's mental condition, appropriated to his own use, and refuses to account to his brothers and sisters for any part thereof.

"Eighth—That by virtue of said deed the said Samuel H. Loder is in the possession of the said land, claiming to be the exclusive owner thereof, and refuses to permit any

of his brothers and sisters to have any part thereof, or of the rents and profits thereof.

"Ninth—The plaintiff further states they and the defendants are in equity the joint owners of said land, each entitled to one-tenth part thereof.

"Tenth—The said William Loder and Edie Loder are made defendants to this action, for the reason that they refuse to join as plaintiffs."

The defendants demurred to the petition because the facts stated therein were not sufficient to constitute a cause of action.   The demurrer was overruled and the defendant Samuel H. Loder thereupon filed an answer, in which he admits that the plaintiffs are the children of William Loder, deceased; that William Loder died on the 4th of May, 1887; that William Loder purchased the land in question on the 26th of March, 1864, and received a deed therefor; that on or about the 25th of May, 1878, William Loder and wife conveyed the land in controversy to the defendant, and all other facts in the petition are denied.

On the trial of the cause the court made special findings and rendered a decree as follows:

"And now on this 8th day of November, 1890, this cause, having been heretofore argued and submitted to the court, came on for decision, and the court, being well and fully advised in the premises, finds as matter of fact:

" First—That the plaintiffs and defendants are the children and only heirs at law of William Loder, deceased, who died intestate on or about the 14th day of May, 1887, leaving no widow him surviving.

"Second—That the said William Loder, now deceased, was the owner of the following described real estate, situated in Cass county, Nebraska, to-wit: The southwest quarter of section 15, township 12, range 9, and made his home thereon, where he resided until his death.

"Third—That the defendants Samuel H. Loder and Edie S. Loder resided with the said William Loder on

said land until his death and have continued to reside there since.

"Fourth—That on the 25th day of May, 1878, the said William Loder, now deceased, and his wife, who was then living, made, signed, and acknowledged a deed purporting to convey said land to the said Samuel H. Loder, but that he, said William Loder, never delivered said deed to the said Samuel H. Loder, but retained control of the same until his death.

"Fifth—That at the time of the making of said deed the said William Loder, deceased, was, owing to disease and old age, mentally incompetent to transact business or to make said deed.

"Sixth—That the said Samuel H. Loder paid no consideration whatever for said deed.

"Seventh—That the said William Loder, now deceased, was, at the time of the making of said deed, and afterwards, possessed of a large amount of personal property, the exact amount of which cannot be determined from the testimony, but amounted to several thousand dollars worth, and that the defendant Samuel H. Loder took and converted said property to his own use and has never accounted for the same, or any part thereof, to any person.

"Eighth—That the defendant Samuel H. Loder has been in the exclusive possession of said land since the death of his father, William Loder, claiming to be the exclusive owner thereof, and refuses to permit any of his brothers or sisters to have any part thereof and refuses to account to his said brothers and sisters for any part of the rents or profits thereof.

"The court finds as conclusions of law that the said deed made by the said William Loder is void and conveyed no title; that the said William Loder, up to the time of his death, had not parted with his title to his said land, and that the same descended at his death to the plaintiffs and defendants as tenants in common. (On the trial the peti-

tion was amended by alleging a want of delivery of the deed.)

"Wherefore it is considered and adjudged by the court that said deed bearing date May 25, 1878, signed and acknowledged by the said William Loder and his wife, purporting to convey the southwest quarter of section 15, township 12, range 9, in Cass county, Nebraska, to Samuel H. Loder, and the record thereof, be canceled, set aside, and held for naught, and that the plaintiffs herein recover judgment for costs taxed at the sum of $162.88."

From which decree the defendants appeal.

The testimony tends to show that William Loder, the father of the plaintiffs and defendants, purchased the land in question in March, 1864, and received a deed therefor; that he took possession of the same and continued to reside thereon until his death in May, 1887; that ten children are now heirs to his estate; that about the year 1870, none of the witnesses testify to the exact date, he was thrown from a horse and his head injured. All the witnesses testifying upon that point agree as to the injury but disagree as to the extent of the same. On the part of the plaintiff the testimony tends to show that after the fall he always complained of his head and of his inability to do business; and that in important business transactions he called his son Aaron. On behalf of the defendant it is claimed that while he suffered at times from his head, yet he was capable of transacting his own business. It also appears that in a year or two after being thrown from a horse he fell from a stack of headed grain on which he was working, or had an attack of sunstroke. The proof upon this point is not very satisfactory, but it is shown that the attack, whatever its nature, affected his head. It also appears that prior to these attacks he had been a vigorous, self-reliant man, full of energy, and accustomed to attend to his own business. He had frequently expressed a desire to have his property equally divided among his children at his death, and had

stated that he intended to retain the same as long as he
lived.   So far as we can judge he was not very liberal in
assisting his children to commence business for themselves.
Samuel is the youngest son and when he became of age he
testifies that he intended to go out for himself, and that his
father promised that if he would take care of his mother
and him that at their death he should have the place, and
that in pursuance of that promise the deed was made.   To
some extent Samuel is corroborated by his youngest sister.
The making of the deed, however, was kept secret as far
as it was possible to do so, and there is no proof of actual
delivery.   The excuse of the defendant for this is that he
is not accustomed to brag about his business.   Samuel paid
nothing for the property, unless it was in caring for his
father and mother.   The mother died in 1885.   Both the
father and mother had been trained to hard labor, and they
were constantly employed until shortly before their death.
The exact age of neither appears to have been known, but
the mother is shown to have been about seventy-three, and
the father some years older.   There is also some testimony
of undue influence on the part of Samuel over his father
and mother and a denial of the same.   All the plaintiffs
testified, in effect, that after their father received the injuries
heretofore spoken of he was forgetful and wholly incapaci-
tated for doing business; and the defendants only denied the
degree of incapacity claimed by the plaintiffs.   A number
of neighbors were called as witnesses by the defendants,
who testify in effect that they considered the father able to
transact business and take care of himself; and the testi-
mony is that upon matters relating to his early history his
memory seemed to be good, but that as to events of a later
date, particularly those since the injuries above spoken of,
his memory was faulty and indistinct.   In this respect
there is a considerable resemblance between the evidence on
that point and that of *Cole v. Cole,* 21 Neb., 84, although
the father was not as badly affected with loss of memory

as Mr. Cole before his death.   Certain it is that the father, after the injuries above spoken of, distrusted his own ability to transact important business, but procured the services of his oldest son for that purpose; yet if the testimony on behalf of the defendant is to be believed, he freely and voluntarily, with full knowlege of the effect thereof, made the deed to the youngest son.

J. C. Fox, a disinterested witness, testified that he "worked there in the spring of eighty-one." He was also there in the winter of eighty-five and winter of eighty-six and worked there in the spring of eighty-nine.

Q. Now you may state what condition the old man was in during that time you were there; what was the trouble, if anything, with him?

A. In regard to what?

Q. His head.

A. He complained sometimes of his head hurting him.

Q. What did he say about it; how it affected him?

A. He said he had dizzy spells.

Q. What would he say about it in regard to attending to business on account of it?

A. As I understood it, Sam attended to the business.

Q. If anybody came there to speak to the old man about business, what would he say?

A. He would refer him to Sam.   He said he was old and trifling and didn't do any business, and he was referred to Sam.

Q. Did you ever see this trouble in his head affect him in any way so as to trouble him in walking?

A. I have been out in the field with him when he said his head was so dizzy that he would have to sit down. That is cutting wheat, or something like that, on a hot day.

Q. How frequently did you hear him complain about his head?

A. I couldn't say how frequently.   He complained a

good deal of his head, but to say how often he complained I couldn't say.

Q. Was it a common thing?

A. Yes, sir; that is when he was working he complained of his head.

Q. Who claimed to be the owner of the farm and the stuff there?

A. Well, as I understood it, I supposed the old gentleman owned the farm. That is what he said himself.

Q. Did you hear him and Sam have any talk about it?

A. Never but once.

Q. When was that?

A. I can't state the time.

Q. As near as you can, was it about the last of your being there?

A. Yes, sir; I think it was.

Q. Somewhere between eighty-five and eighty-six?

A. Some time, I don't just recollect what time.

Q. State how that circumstance was, and what was said.

A. I don't know as I can tell the whole circumstance or not.

Q. Tell us as much as you can.

A. It was a kind of a racket, as I would call it; something in regard to the things there, the way Sam was doing to the crib, I believe, and the old man tried to get him—he was opening a door, if I recollect right, and Sam was hammering at it and the old gentleman didn't want him to do that way, he wanted him to be easier with it, and I believe Sam said he was running that thing, and he would do as he pleased, and the old gentleman said he was running it and they got into a conversation; as I understood it, the old man said he owned the farm, owned the place.

Q. What did Sam say?

A. Well, I can't just recollect what Sam did say.

Q. As near as you can tell.

A. Well, I believe Sam told him to take the place and

go to the devil with it, or something like that; that is as near as I can recollect about the affair.

In addition to the secrecy in regard to making the deed there is considerable other testimony tending to show that the father claimed to own the farm till at or near his death, and in view of the strong conflict in the evidence it is impossible for the court to hold that the ruling of the trial court was wrong if we had doubt on that point, which we have not. The judgment of the district court is right and is

AFFIRMED.

THE other judges concur.