Holladay v. Rich.

The judgment of the district court is sustained by the evidence and the decisions of this court, and it is

ᐧAFFIRMED.

ROSE, J.

I concur in affirmance.

SEDGWICK, J.

I concur in the result affirming the judgment.

---

KATE M. HOLLADAY, APPELLANT, V. WILLIAM HENRY RICH ET AL., APPELLEES.

FILED SEPTEMBER 28, 1912. No. 17,047.

1. **Deeds:** EQUITABLE TITLE. Where· the plaintiff was the daughter of the decedent, and became possessed of $300 by devise, and gave the same to her father toward his support, and also turned over to him her earnings during many years as a teacher, for the same purpose, and after her marriage she became, by a conveyance from her husband, the owner of certain village lots, and sold the same for $500, and her father collected the money and retained it in his possession by her consent, except $125, and the daughter also became the owner of 320 acres of land by a gift from her husband, and the father was permitted by the daughter to collect the rents from the same, and the money collected as rent and that reserved from the sale of the lots was used by the father, with the daughter's consent, in paying off a mortgage upon the farm occupied by the father, and the plaintiff, with her husband's assistance, further helped the father by paying taxes on the said farm, and also continued to contribute to her father's support, and prior to and during the time the said money was being so furnished and so used the father promised to convey the farm to the daughter, without other consideration than that he had received from the daughter, and made improvements upon the farm, saying that the farm was for the daughter and that the improvements were made for her, and he also joined her name with his as lessor of the farm in making yearly leases to the farm tenant who cultivated the same in crops, and the father also conveyed the land (his wife joining

him) to the daughter by an absolute deed of conveyance, and the deed was delivered to her, although subsequently returned to the father for correction, and was then not returned to the daughter, it will be *held*, in a suit by the daughter to quiet title to the premises in herself, that she had, at the time that the deed was so returned to her father and kept by him, an equitable claim against the said premises and an inchoate title thereto which might be enforced against the father and his grantees with notice of the daughter's rights.

2. Mortgages: VALIDITY. And where, upon the death of the decedent's first wife, who was the mother of the plaintiff, and who joined with the decedent in the execution and delivery of said deed to the daughter, and who had joined with the father in the promise to convey to the daughter, the father married a second wife, and the father, while in ill health, being much enfeebled in body and mind and apparently addicted to the use of opiates and apparently having only a short time to live, being about 80 years old, was induced by the second wife, who was to be in part benefited thereby, and one M. B. K., who was a traveling preacher, to execute and deliver to one Rich a conveyance absolute to said farm, under an arrangement whereby said Rich was to make certain notes and a mortgage upon the farm, amounting to $7,000, being the full purchase price thereof as agreed, and then the notes and mortgage were to be delivered to a college in Wisconsin which was being conducted under the auspices of a church association to which the said traveling preacher belonged, and without other consideration than the promise in writing upon the part of the college to pay to the father during his life the interest as it fell due according to the notes given, and after his death to the widow until her decease, and then the notes and mortgage were to be the exclusive property of the college, and this arrangement was consummated and the deed was made to Rich by the father and his wife, the plaintiff's stepmother, and the notes and mortgage were duly executed by Rich to the father, and were then delivered by the father to M. B. K., the traveling preacher, and then were turned over to the college by the preacher, it will be *held*, first, that the notes and mortgage were obtained by undue influence of the wife and M. B. K. upon the father of the plaintiff, and that the college received them without paying any valid consideration therefor; and it further appearing that the wife and M. B. K. knew of the daughter's interest in the premises, *held*, that the college could not be, and was not, an innocent holder of the notes and mortgage, and that the legal title to the premises was held by the defendant Rich in trust for the plaintiff, and that the notes and mortgage held by the college were held in trust for the plaintiff, and that the

deed, notes and mortgage should be canceled and title to the premises quieted in the plaintiff.

3. **Quieting Title:** EVIDENCE. An examination of the evidence discloses that, after the making and delivery to the daughter of the deed for the premises above set forth, the father sent for the deed, representing that he wished to correct it, and when the deed was returned to him he retained it, and it was subsequently arranged between the father and the daughter that the daughter should come .upon the premises and occupy the same as a home for herself and her husband and children, providing for the father and his wife, the stepmother, and the daughter then came from Kansas City, where she resided, to her father's house, and was then ready to occupy the premises and to proceed with the agreement, and when she did so the father then claimed that he had rented the land to said Rich the day before, and seemed unwilling just then to proceed with the agreement; that the evidence shows an attempted evasion of the terms of the contract induced by the undue influence of the plaintiff's stepmother and others who were seeking to procure a gift of the property or its value to the college in question.

APPEAL from the district court for Valley county: JAMES N. PAUL, JUDGE. *Reversed, and decree entered.*

*E. J. Babcock, A. Norman* and *O. A. Abbott,* for appellant.

*Clements Bros., E. J. Clements, R. L. Staple* and *Ray W. Clark, contra.*

HAMER, J.

· This is an appeal from a judgment of the district court for Valley county dismissing the petition of the plaintiff, who brought her bill in equity to quiet title to the northwest quarter of section 33, in township 18 north, of range 13 west of the 6th P. M., in Valley county, Nebraska, alleging that she was the daughter of Charles Badger, deceased, and that he had died in December, 1906, and that at the time of his death Mary B. S. Badger was his surviving widow, and that Milton College of Milton, Wisconsin, was a corporation organized under the laws of the state of

Wisconsin; that while she was a member of her father's family she became possessed of the sum of $300 by devise, and that she gave this money to her father; that she was a teacher, and that she also turned over her earnings as a teacher to her father, and that after her marriage she and her husband both contributed to the support and maintenance of the father; that they assisted him in paying his taxes, debts, and otherwise; that the plaintiff was the owner of 320 acres of land in Valley county, and that she permitted the use of this land to her father for a number of years, and allowed him to retain all the receipts therefrom; that she also owned lots 3, 4, 5 and 6, in block 23, in an addition to the village of North Loup, in Valley county; that the plaintiff became the owner of this property by a conveyance made to her by her husband; that she sold the lots above mentioned for the sum of 500, and that her father collected the money, and gave her the sum of $125 out of the $500, and she permitted him to retain the remainder; that the remaining sum of $375 retained by her father was used in the payment of a mortgage upon the said northwest quarter of section 33, township 18 north, of range 13 west of the 6th P. M., in Valley county, Nebraska, being the land in controversy in this action; that title to said land last above described was by said decree of the district court for Valley county quieted in the defendant William Henry Rich, subject to the lien of the mortgage hereinafter described and held by the defendant Milton College, and which decree quieted and confirmed the title of said Milton College in the said mortgage and the notes which it secured, being the notes made by William Henry Rich to Charles Badger, and by said Charles Badger transferred to the said defendant Milton College.

The father was a doctor on the frontier, and he seems to have always been in poor financial circumstances. After the plaintiff's marriage, she and her husband went to Kansas City to live, but they made frequent trips to Nebraska, and were not unmindful of the father. They helped him pay his debts, and they helped him to live, and seem

to have been devoted and loyal. There seems to have been an unwritten agreement between the father and daughter by which he was to have the use of the 320 acres of land that belonged to the daughter, and he was to use the money realized from the use of this half section in paying off the mortgage on the land in controversy, and also toward his own support. About the year 1901 the father and the mother of the plaintiff executed a conveyance to her, but subsequently the father desired to have it returned to him so that he might put her husband's name in the deed, and she sent it to him, but he kept the deed and did not afterwards deliver it to her. There seems to have been no trouble of any kind until after the first wife of the deceased died. She was the mother of the plaintiff, and after the first wife died the deceased married the defendant Mary B. S. Badger about September, 1899. After the marriage of the deceased to the defendant Mary B. S. Badger, the plaintiff was induced to trade one of her tracts of land to the said Mary B. S. Badger for another tract of land of less value, and there seems to have been an understanding that she was to be recompensed for the difference in value, but this was not done. About April 13, 1905, the deceased, Charles Badger, and the defendant Mary B. S. Badger executed, acknowledged and delivered a deed to the defendant William Henry Rich for the said northwest quarter of section 33, and Rich executed and delivered to the said Charles Badger a mortgage upon the said land for $7,000 securing notes of various size to that amount, the first due November 1, 1905, and the last due April 1, 1913, all notes bearing interest at the rate of 6 per cent. per annum. Rich paid no money and gave no consideration for the land except the notes and mortgage. The conveyance to Rich and the mortgage made by Rich to the deceased were executed and delivered in pursuance of an agreement for a gift to the defendant Milton College. Milton College seems to be an educational institution at Milton, Wisconsin, and is run under the auspices of the Seventh Day Adventists. It was one of their preachers

who seems to have been active in procuring the gift to be made. He was temporarily stationed at that time at North Loup, and seems to have been a traveling evangelist. The defendant Mary B. S. Badger seems also to have been active in procuring this gift to be made, and the evidence would seem to show that she became a beneficiary at or about the same time the gift was made. ·She was ten years younger than her husband at the time the conveyance to Rich was made. The testimony discloses that the deceased at the time of the execution of the deed to Rich was quite feeble, and that he was infirm in mind and body, being unable much of the time to remember and recognize his neighbors whom he frequently met. He seems also to have been in the habit of taking a white powder, which may or may not have been morphine, but the testimony seems to indicate that it was. He was greatly addicted to the use of it. He died within about 18 months after the execution and delivery of the deed to Rich. It was apparent at the time that he executed the deed that he did not have long to live. Of course, the traveling preacher who received the mortgage and notes made by Rich was aware of that fact when he received them and sent them to Milton College. Milton College agreed to pay interest on the notes to the time of the death of the deceased, and after that to his widow until her decease. Of course, if Rich paid the interest to the college, then the college would not be out any money. It was a gift to the college. In his testimony M. B. Kelly, the traveling preacher, testified: "I had something to do with it between the college and the doctor." He says: "He asked me to do the writing for him, which I agreed to do, as corresponding worried him." He says of himself that he resided at Milton for two years. "I was an evangelist, a traveling preacher of the gospel, holding revival meetings." He testified that his headquarters were at Milton, but that he was not there much. The reasonable inference is that he was out traveling in his business as an evangelist. On cross-examination the preacher says of Badger's condition: "He was

in what we would call in a decrepitude of age." He says that he (Kelly) wrote to the president of Milton College, but, with an appearance of being disinterested, he says: "I am not sure it was *before* or *after* deed was made." He also says: "I don't remember whether I asked the president to write him. *Possibly I may have in regard to this business,* I don't remember any such thing in the correspondence, deed, the notes, and mortgage made at the same time." Again he says: "This correspondence with Milton College in reference to acceptance of this donation and what they would do *nearly all transpired through me.* I am rather of the opinion the doctor wrote some letters himself. I am not sure. He told me he contemplated writing, or had written, or something to that effect. The agreement was sent to me, and I handed it to the doctor. I think I forwarded the notes and mortgage *as a matter of correspondence.* I am not sure." The two letters of the evangelist to the president of the college read like songs of triumph: "I have the pleasure of sending you in this mail the mortgage and notes for $8,000 assigned this day to Milton College by Dr. Charles Badger and Mary B. S. Badger, his wife. You will doubtless be agreeably surprised to find it $8,000 instead of $5,000. But the more they thought it over the more they felt they should give their means to Milton College, so here it is. * * * I hope the contract to be executed and returned by you will be attended to very promptly as the doctor will not rest easily until the last thing is attended to. It has been a great anxiety upon his mind of late, and in his declining health he should be freed from all such anxiety." May 22, 1905, three days before sending the letter to the president from which the foregoing excerpts are made, the preacher wrote him a letter from which the following is taken: "I have the honor to tell you that, after reading your letter to Dr. and Mrs. Badger and talking the matter over with them, they readily accepted your suggestion, and expect this week to make a direct transfer of five of the one-thousand dollar notes to Milton College with the

**10**

understanding that the trustees are to execute an agree-
ment to pay him six per cent. interest on the same till his
death, and afterwards to Mrs. Badger (should she survive
him) as long as she lives. * * * Had your first letter
reached Dr. Badger a few days sooner, Milton College
would have received the entire $8,000. * * * Hoping
this will all be satisfactory to you and rejoicing in the
privilege of *bearing even a small part* in this worthy trans-
action, I remain, very sincerely yours, M. B. Kelly."

The president of the college testified that he had seen
the doctor at North Loup in 1904, and that he first learned
of the doctor's intentions in the spring of 1905 *through a
letter written by his pastor, Rev. M. B. Kelly.* He also
testified, in substance, that he was *relying upon Kelly to
carry the negotiations through.* "Q. Well, then you re-
lied on Mr. Kelly to see that the transaction was carried
through? A. Certainly in that sense I did." The defend-
ant, Mary B. S. Badger, testified that she was married to
the doctor July 20, 1898, and lived with him 8 or 9 years.
She had been at Milton, Wisconsin, she says, "visiting and
doing business;" that she resided with the doctor the rest
of the time. The deed made by Charles Badger and Mary
B. S. Badger to William Henry Rich for the land in con-
troversy is dated April 13, 1905. It is an ordinary war-
ranty deed. It is acknowledged before R. L. Staple, no-
tary public. The mortgage is for $7,000, is of the same
date, and was also acknowledged before R. L. Staple,
notary public. The assignment of the mortgage and notes
by Charles Badger to Milton College bears date May 25,
1905, and was acknowledged before R. L. Staple, notary
public. All three of these instruments seem to have been
executed in the presence of M. B. Kelly. The deed and
mortgage were executed and witnessed in the presence
of, and witnessed by, M. B. Kelly and Kate T. Kelly, while
M. B. Kelly and R. L. Staple witnessed the assignment.

Mary B. S. Badger was interested in getting the prop-
erty or its value into Milton College for the reason, first,
that she would get interest on the value of the property

from the college after the doctor's death. If the property had been transferred to the daughter, Mrs. Holladay, then Mary B. S. Badger would have received no benefit from it. The mother of the plaintiff, who was the first wife of Dr. Badger, died in June, 1897. The next year the doctor married the defendant Mary B. S. Badger. Milton College claims to be an innocent holder of the mortgage, but sets up a contract between Charles Badger and Mary B. S. Badger, of the one part, and the plaintiff and her husband, of the other part, by which the plaintiff and her husband agree to farm and manage in a workmanlike manner the land in question, and to pay all taxes and make all improvements, and to furnish said Badger and wife "all they may need for their home and support, also feed for one horse, one cow, one pig, and a few chickens on the above described farm." The instrument also provides that "at the death of the said Charles Badger and wife, Mary B. S. Badger, the said Kate M. Holladay and husband, William J. Holladay, shall come into full and immediate possession of said property; and this lease put on record shall be to the said Holladays a full and complete title to said property free and clear from all incumbrance of every form and kind." This instrument is dated August 8, 1902. On the 15th of June, 1903, William J. Holladay and Kate M. Holladay, his wife, seem to have executed a quitclaim deed to Charles Badger and Mary B. S. Badger by which they released the land from the foregoing contract. Milton College, by its president and secretary, executed an instrument by which it undertook to pay interest at 6 per cent. per annum on the $7,000 Rich notes and mortgage.

An examination of the record discloses the fact that Milton College gave nothing for the $7,000 mortgage and notes except a guaranty that the interest would be paid. Of course, if Rich paid the interest, the college would be out nothing. The college received the notes and mortgage and assignment under circumstances which were such as to compel it to take notice of the rights of the plaintiff.

The defendant William Henry Rich was not called as a witness, but he knew Dr. Badger and the plaintiff, and he was farming the land, and undoubtedly knew the circumstances, and he so testifies in his deposition taken in support of the plaintiff's motion for a new trial: "Have lived in vicinity 12 years. Have been acquainted with Dr. Badger since I lived here—10 or 12 years. * * * I rented the place I live on now from the doctor one year before I bought it. I bought it April 5 next year after I rented it. Don't remember the year. Deed was delivered to me at Dr. Badger's house. I delivered to the doctor a mortgage same day. Mr. Staple was present and drew it up, and Dr. Badger and his wife, preacher Kelly and his wife, all there. *No money was paid by me at that time.* The deed was delivered to me, and he says, 'Take that deed and get it recorded as soon as you can.' Don't remember that anything was said at that time about a former deed to Kate M. Holladay. 'Well, he told me once that he gave them a deed and it wasn't just right and he wrote to have it sent back.' * * * Q. Did you see anything he claimed was the deed? A. Well, he had some papers there that day, I could not tell whether it was a deed or not. * * * Q. Did you know what he did with that deed that day? A. Well, I don't remember whether it was the deed, or what, but he had a handful of papers, and asked Mr. Staple if he would need those any more, and Mr. Staple said, 'I don't think so,' and he put them in the stove. I don't think he showed the papers to Mr. Staple at that time. I don't know, I don't think Mr. Staple examined them. I didn't hear any remarks at that time about Mrs. Holladay having failed to keep her engagements. Q. Did you ever hear any remark of that kind? A. Well, when they moved up to take possession of that land, they moved up in the fall before. At that time I was in possession of that farm. Yes, sir; I lived on it, and had it leased for that year, and a verbal contract for the next year, but no lease. Q. And a verbal agreement for the renting of it next year, and at the time this verbal agreement was made, was that

the time he spoke about the deed? A. What deed? Q. The deed he sent for? A. Oh, no, no; he always spoke of the place when he spoke of the place as *Kate's place.* Q. How often did he speak of it as Kate's place? A. Oh, whenever he wanted to make a change or fix it up. Q. He then spoke of it as Kate's? A. Yes, sir. Q. Do you remember whether your lease was signed by him as agent, or by both their names? A. It was always signed by agent. Q. By him as agent? A. Yes, sir. * * * A. No, sir; I never saw this deed he spoke about. I don't remember that he told me it hadn't been recorded. No; I don't think he did. No; not to me he didn't say it was no good because it had not been recorded. I couldn't tell how long before the deed was made to me that he spoke about the deed and having gotten it to have changes made. I have no idea. No; he never told me what changes were to be made in it or why he had it sent back. Q. Did he have reference to that deed when he took those papers and put them in the stove? A. I couldn't say, but he made that remark that he didn't think he would have any more use for those papers and put them in the stove. * * * Q. And it was while you were in possession of it the second year? A. I had had my contract fixed up before that occurred. She came up here and wanted him to put me off so she could have it, and he said, 'Why, I have rented it for another year to Mr. Rich and I couldn't do that,' and I felt like I was in the soup until I got the contract renewed. Q. That was the verbal contract? A. No; we was to make out the contract later on, and I took the contract down and had it renewed, so he wouldn't change his mind. Q. Was she present when you talked with the doctor about getting possession of the property? A. No; I was down there one time, and I had a piece of fall wheat in, and they had notified me before, and I told them there was the pasture and I would like to keep that. Q. You mean what cultivated ground there was he wanted? A. Yes; there was 50 acres broke out, and I wanted to keep the pasture. No, sir; I never saw this deed he said he had. No, sir; I

wouldn't know. I couldn't tell whether the paper he burned was a deed or mortgage. He had the lease and I had a copy. No; I couldn't say it was the lease he burned. Mr. Staple said he didn't think there was any use keeping them any more, and then he said to me, 'Be sure and have yours recorded right away.' No, sir; nothing said about a deed not being good unless it was recorded that I remember."

From the foregoing it would seem that, when Mrs. Holladay went up to North Loup to live on the land, she was ready to take possession, and her father was keeping her out of the possession, and this man Rich was helping him to do it. That the doctor intended the land for his daughter, the plaintiff, is shown by the testimony of many persons. Seventeen witnesses in varying phraseology testify that they heard the doctor say that the farm was for his daughter, Kate. He would say that whatever was done on the farm was done for Kate. He seems to have delighted to tell his neighbors about the farm that he intended it for his daughter.

Clement Meyers and his brothers had rented the farm in controversy from 1896 to 1902. The leases were signed Kate Holladay by himself. "Q. Had you any talk with him about this farm in connection with his daughter, Kate? A. He always said it was her farm. * * * When we were making the last contract, he reserved the stalks, said his daughter and Mr. Holladay were coming up, and he even reserved the straw. When they enlarged the cellar, he said they were making that improvement so that, when they came up, they could have a decent house (the Holladays). When we put on a windmill, Mr. Holladay was there at the time. He asked Mr. Holladay where he wanted the windmill. * * * Q. And when was it you heard the doctor say the Holladays were coming up to occupy the premises? A. I heard him say that a thousand times probably. Well, every time we had any conversation with him, he would say they was coming up, or that this is their house. Occurred all the years we occupied it." He says of the leases which he made with the doctor for the

land that they made a new lease every year. "I think Kate M. Holladay and Dr. Badger's names signed to all of them."

Harry Meyers: "Yes; he always mentioned Kate Holladay in connection with the place. There was no one like her. We were on good terms most of the time. Yes; at the last. I took him some meat while he was sick abed. Well, he would lots of times mention that he was going to fix this for Kate; that they were coming pretty soon, and this and that, and everything that was done was for Kate. Well, I helped put down a foundation around the cellar, and it was fixed for the Holladays, and about fixing the windmill."

Lynn Holladay: His grandfather gave him the deed for the farm to take to his mother. At that time the doctor said: "This deed to my farm I want you to take to Katie so that when I am dead she will have it."

The witnesses for the defense do not deny the statements made by the witnesses for the plaintiff concerning the fact that the farm was Kate's farm, or was to be Kate's farm. They do not deny that the specific things were said to which the witnesses testify.

It is urged by the appellees that the husband of the plaintiff was disqualified to testify under section 329 of the code because he had a direct legal interest in the result. It is urged that the plaintiff's husband would be liable for the costs because he was once a party plaintiff in the action. It is hardly necessary to discuss this question, as the testimony of the other witnesses abundantly establishes the plaintiff's case.

William J. Holladay, in 1904, while his wife, the plaintiff, was up at North Loup visiting Dr. Badger, turned the 320-acre farm over to Everingim, the agent of his wife and himself. And the arrangement was made that the Holladays were to take charge of the quarter section in controversy that fall. The doctor had himself said that he was unable to attend to the farm any longer. Then Mrs. Kate Holladay, the plaintiff, went from Kansas City to

North Loup in August, 1904, to take possession of the farm in controversy, and when she got there she found out from her father that he had rented the land to the defendant Rich the day before she arrived. It seems that he did not then want her to have the land. Her daughter was with her, and they were ready to go on with the arrangement to take care of the old folks, but, as the land was rented to Rich and they could not get possession of it, they went back to Kansas City.

### Dr. Badger's Condition.

Oscar Babcock saw him every day. He had a farm back of the doctor's house 8 or 10 rods. He worked every day. He testified that the doctor said he could not keep up without medicine; that the doctor said to him, " 'I can't leave it alone, I can't live without it.' Said he used the purest article he could get, didn't buy it there in town. He said he could get a better article by sending away for it, and he said, 'I sent away a while ago,' to Chicago, I think, can't remember places, but he said he bought $4 worth at one time, and he regretted that he had to use it. Said, 'I can't keep up without it.' "

H. A. Watts testified that he met him in 1905, after being away, and noticed that he had failed physically and mentally. "He was very childish when I was working for him. One day he would tell me how to do a thing, and in an hour say it would be some other way, and when he got through started right back and had to ask how to write my name. I would meet him on the street, and talk to him, and he would say, 'I don't know you,' and I would tell him, and he would say, 'By jolly, I didn't know you.' "

E. S. Sears testified: "When I first became acquainted with him, he was a remarkably bright and vigorous man, and the last few years he got very bad physically, and his mind got weak, of course.  *  *  *  In spite of the fact that we had been intimately acquainted for the past years, if I would meet him on the street and speak to him, he would say, 'I can't call your name,' and I would tell him who it was, and he wouldn't seem to be able to place me,

and the last year I didn't speak to him at all.   \*    \*    \* Toward the last the increase became very marked."

W. A. Prentice testified: "I passed the doctor and Mrs. Badger in the vestibule, and, as usual, reached out my hand. He barely touched it, looked up, saw who it was, and immediately jerked his hand away and went away. Nothing like that ever occurred before, not to my knowledge. Well, in connection with the same incident, just a few days after I met him on the street, and he failed to recognize me. I spoke. He made no reply. I stepped right in front of him, and said, 'Doctor, what is the matter, have I ever injured you in any way, shape, or manner? If I have, I don't know it.' He said, 'Only by inference, Mr. Prentice, only by inference.' I said, 'Doctor, if I have ever laid a straw in your way, I don't know it.' He reached out his hand, and said, 'If that is the way, everything is just like it was.' I noticed he was just breaking down physically and mentally. I am not a medical man. I have never seen him, to my knowledge, take any medicine in all the years I have known him, except I have seen him occasionally take a powder from his pocket and take it." This witness testified that the doctor wanted to trade him a farm worth $2,000 for a little residence in the village worth, perhaps, $450. He seems to have wanted to trade even. He says that he would have traded with the doctor only he didn't consider that he was competent to do business. "From my knowledge and observation of persons addicted to opium, it has always been my opinion that the doctor was addicted to opiates, and it has increased. From my observation and experience he was not capable of transacting business in 1905."

G. L. Larken was a plasterer and brick mason. "The doctor called me to tear down his chimney. He thought a brick had fallen in, and wanted me to tear down the chimney and get it out. I went out and looked at it. No brick had fallen from the top. Got down and looked inside, and didn't see anything, and didn't fix it. Well, sir, the reason why I didn't fix it was because I didn't think it

needed it, and one time when I was there he called me in, and his wife showed me the door, or he went in another room, and she said, 'I don't think it needs it, I wouldn't pay any more attention to it.' * * * I thought there was nothing the matter with it, and thought he was kind of childish about it."

E. J. Babcock: He knew that Dr. Badger was over 80 when he died. He visited the doctor. He told Babcock that he had given his library to a Dr. Wilson of North Loup, also that he wanted to give away his household goods and furniture because he would not need them much longer. He found him "growing old and getting exceedingly infirm, and about the time the first wife died he didn't know me. When I would tell him who I was, he would say, 'Ah, yes.' It kept getting a little more and a little more marked. I would see him generally when he was around doing chores. Sometimes he would seem more dazed than others. He would start to town so we all noticed it. There was a telephone pole there or a tree, and he would commence running as though he would fall and would catch hold of that. One time I started to catch him and help him, and a good many times he would not know me, and those times kept growing."

The witnesses for the defense concerning the condition of Dr. Badger do not deny that he was weak and feeble. They only failed to see evidence of the fact that he used opiates. He gave the evangelist preacher Kelly his horse and buggy. He afterwards took from Kelly a paper which was so intangible that Kelly does not remember whether it was a promise to pay money, and, if so, how much. He says of it: "This was a transaction I did not consider of great importance. It did not weigh heavy on my mind." In a letter dated March 3, 1904, Mrs. Mary B. S. Badger describes the doctor at that time as being very nervous, and very much worn out, and not fit to do any business, and so forgetful as to be unable to remember "while he is turning around." In that letter she says that he "cannot hold out many years longer." In another letter she de-

scribes the doctor as "not fit to do business of any kind," and also says: "I can see his memory fail every day. * * * There is no question but what his brain is bad, and heart also."

One of the witnesses for the defense in this case is Mr. Theodore L. Gardiner, whose deposition was taken. He is shown to have resided at North Loup from September, 1906, to August, 1907. He had been the pastor of the Seventh Day Baptist Church of North Loup. He was at one time president of Salem College. At the time he testified he was the editor of Sabbath Record. He testified to going to Ord, the county seat of Valley county, to get a deed which had been made to him in trust for Mary B. S. Badger, one of the defendants in this case. He describes the deed as a conveyance of the house the doctor lived in, and one-half the lot. He says: "The deed I referred to was made to me in trust for his wife's use while she lived, and at her death to sell it and pay Milton College $1,000 out of the proceeds thereof." He testified: "The paper I went to the county seat for was the deed to me." He says of the deed it was a regular deed. The abstract of the evidence does not go fully into the details of this deed and the $1,000, but there is a reference in the testimony of Albert Whitford, who describes himself as treasurer of Milton College at Milton, Wisconsin. He says in his evidence:

"I knew of the transaction between Dr. Badger and Milton College. The notes and mortgage assigned to the Milton College came to my hands. I have had them since. I have made payments to Dr. Badger as follows:

"Jan. 17, '06........$240    "$210 on account of his mortgage, and $30 on account of his wife, her mortgage for $1,000.
"Apr. 2, '06........$240
"Apr. 22, '06........$240

"(Receipts are shown on Bill Ex., page 348.)

"Since Badger's death I have paid Mary Badger as follows:

"Apr. 5, '07—$240; Oct. 17, '07—$240; Apr. 17, '08—

$240; Oct. 14, '08—$240. I have received from Mr. Rich $1,030.86 in all ($430.86 int.; $600 principal)."

These entries point to an additional interest which the defendant Mary B. S. Badger had in the transaction. She acted with Milton College in procuring mortgages and notes to be made. After the husband died she would get the interest payments from the college, and, in addition, there was another $1,000 that was a lien upon the house and lot upon which they lived. She got an additional benefit out of that. It was probably not very difficult for the traveling evangelist and this second wife to control the old doctor in his sickness and his feebleness.

In a recent case of *In re Estate of Paisley,* 91 Neb. 139, this court was called upon to determine the condition of the testator at the time he executed a will in favor of the proponent. The reasons in that case for setting aside the will and guarding the interests of the relatives of the testator are very like the reasons which exist in this case as to whether the deed to William Henry Rich and the mortgage made by him should stand. The judgment of the lower court in the *Paisley* case was reversed because of the feebleness of the testator at the time the will was made, and because of the undue influence of the proponent and her sister and brother-in-law. In the instant case, Dr. Badger seems to have been naturally frail and delicate physically, and his powers of mind seem to have been reduced by long continued illness and old age, for he was beyond 80, and he was without means to resist the importunities and influence of his younger and stronger wife, and the rather adroit Mr. Kelly, who was seemingly anxious to commend himself to the college corporation for his efficient services in procuring financial aid. Our view concerning the condition of the grantor at the time of making the deed and mortgage and the exercise of an undue influence in making the deed and consummating the thing does seem to be sustained by the following cases: *In re Estate of Frederick,* 83 Neb. 318, 321; *Orchardson v. Cofield,* 171 Ill. 14, 40 L. R. A. 256, 63 Am. St. Rep. 211;

*Purdy v. Hall,* 134 Ill. 298; *Hampson v. Guy,* 64 L. T. Rep. n. s. (Eng.) 778; *Hegney v. Head,* 126 Mo. 619, 29 S. W. 587; *Bennett v. Bennett,* 65 Neb. 432, 441. The case last cited is instructive and fully sets forth the views of this court. Among other things held are the following: "Although mental weakness may fall short of entire incompetency to transact business, if it is taken advantage of to procure a conveyance by inequitable means the conveyance may be set aside." Also: "A court of equity will scrutinize jealously a transaction as to which there is ground for holding that influence has been acquired over a person of weak mind and has been abused." In support of the first point the court cited *Loder v. Loder,* 34 Neb. 824; *Kleeman v. Peltzer,* 17 Neb. 381; 2 Pomeroy, Equity Jurisprudence (3d ed.) sec. 947.

An examination of the evidence shows that the deceased, Charles Badger, at the time of the execution and delivery of the deed to the defendant William Henry Rich, was feeble and infirm in body and mind, and also at the time he delivered the said notes and mortgage to the defendant Milton College, through M. B. Kelly, that he was unduly influenced and overpersuaded by the said M. B. Kelly and his wife, Mary B. S. Badger, and that the said conveyance to the defendant William Henry Rich and the said notes and mortgage delivered to the said defendant Milton College were so executed and delivered without consideration.

The judgment of the district court is reversed, and the conveyance of the land by deed to William Henry Rich is set aside and canceled, as also the notes and the mortgage executed by said Rich and delivered to the said Milton College, and title to the land in controversy, to wit, the northwest quarter of section 33, in township 18 north, of range 13 west of the 6th P. M., in Valley county, Nebraska, is forever quieted in the appellant, Kate M. Holladay.

REVERSED.

Sedgwick, J.

I concur only in the result reversing the judgment of the district court.

Rose, J., dissents.