KATE M. HOLLADAY, APPELLANT, V. WILLIAM HENRY RICH
ET AL., APPELLEES.

FILED MARCH 28, 1913.   No. 17,047.

1. **Witnesses:** COMPETENCY. In an action by a married woman for specific performance of a contract to convey real estate, her husband has a direct legal interest in the result, within the meaning of section 329 of the code.

2. ——: ——. In an action to set aside a deed executed by a person afterwards deceased, because the same was executed in violation of an alleged contract of the grantor with the plaintiff, the defendant who claims under such deed is the representative of a deceased person, within the meaning of section 329 of the code.

3. **Bills and Notes, Gift of:** RIGHTS ACQUIRED. One who takes promissory notes as a gift without paying any consideration therefor takes only the right of the donor therein.

4. **Vendor and Purchaser:** INNOCENT PURCHASER. One who purchases land to be paid for wholly in the future is not an innocent purchaser for value as against the rights of a third party of which the purchaser has notice before making payment.

5. **Quieting Title:** EVIDENCE. This being an action in equity, we have examined the evidence, some of which is outlined in the opinion, and find that it supports our former judgment in favor of the plaintiff, which is therefore adhered to.

REHEARING of case reported in 92 Neb. 91. *Former judgment affirmed.*

SEDGWICK, J.

Dr. Charles Badger some time before his death sold and conveyed the land in question to the defendant William Henry Rich, for the agreed price of $7,000, and took in payment therefor notes secured upon the land. Afterwards, Dr. Badger transferred the notes to the defendant Milton College, a Wisconsin corporation. The plaintiff brought this action in the district court for Valley county, and alleged that Dr. Badger had agreed to convey the land to her for a sufficient consideration, and had, pur-

suant to that agreement, actually executed and delivered a deed thereof to her, and asked that the conveyance to Rich be set aside and her title quieted in the land, or, if the deed to Rich was held valid, that the defendant Milton College be required to turn over the notes to her. The defendant bank was made a party because the notes had been deposited in the bank. The trial court found the issues generally in favor of the defendants, and the plaintiff has appealed. Upon a former hearing the judgment was reversed and a judgment entered in favor of the plaintiff. 92 Neb. 91.

William J. Holladay, the plaintiff's husband, was called as a witness for the plaintiff, and the defendants objected on the ground that he was disqualified under section 329 of the code, which provides: "No person having a direct legal interest in the result of any civil action or proceeding, when the adverse party is the representative of a deceased person, shall be permitted to testify to any transaction or conversation had between the deceased person and the witness," with specified exceptions. In *McCoy v. Conrad*, 64 Neb. 150, it is said: "In order to justify excluding this testimony three things must concur: First, the witness offered must have a direct, legal interest in the result of the litigation; second, the evidence offered must relate to transactions and conversations had between the witness and deceased; third, the evidence must be offered against one who is a representative of the deceased person." Does Mr. Holladay have a direct legal interest in the controversy? In the commencement of this action he was joined as plaintiff. Later the action as to him was dismissed. It is insisted that his liability for costs makes him directly interested. But his liability for costs is limited to costs incurred by the defendants while he was a party. And it does not appear that the defendants incurred costs during that time that they could recover from Mr. Holladay if they were successful in the action. Is Mr. Holladay's interest as husband of the plaintiff of such a character as must be held to be a direct legal in-

terest within the meaning of the statute?   In *Gillette v. Morrison*, 9 Neb. 395, it is held that in an action by a married woman in regard to her separate property the husband has no direct legal interest in the result of the suit.   And in *Hiskett v. Bozarth*, 75 Neb. 70, the precise point here involved was presented, and it was held that the husband was not disqualified.   But in *Wylie v. Charlton*, 43 Neb. 840, it was held that in a similar action by the husband the wife was incompetent as a witness because the wife's inchoate right of dower was a charge and incumbrance upon the real estate of the husband, and could not be avoided except by the voluntary act of the wife.   This case was cited in *Hiskett v. Bozarth, supra,* and distinguished from that case on the ground that the husband's right of curtesy "may be defeated by the deed of the wife and without the consent of the husband," but this is not true under the statute, as it now exists.   Comp. St. 1911, ch. 23, sec. 1.   Under that statute the husband has an interest in the real estate of the wife that cannot be defeated by any act of the wife.   So that now the rule announced in *Wylie v. Charlton, supra,* applies equally to husband and wife, and under that rule Mr. Holladay had a direct legal interest in the result of the suit, within the meaning of the statute.

The plaintiff contends that the adverse party was not the representative of the deceased, within the meaning of the statute, and quotes the following also from *McCoy v. Conrad, supra:* "The statute is 'limited in its reason and spirit by fair construction to contests on litigation upon claims between other persons and the deceased, existing prior to his death; to such suits and proceedings as the deceased would have been, if living, a necessary party, and since which his heirs, devisees, and legatees, personal representatives or assigns, are compelled to prosecute or defend for him in his place.'" This language was quoted from the supreme court of Michigan.   The last clause of the quotation is not as accurate as the first.   The plaintiff's claim as against Dr. Badger existed prior to his

death. Dr. Badger conveyed this right to Rich. Mr. Rich, therefore, as Dr. Badger's assign, is compelled to defend for him in his place. In *McCoy v. Conrad, supra,* and *Williams v. Miles,* 68 Neb. 463, the right of property, the ownership and title of the deceased were not questioned. Here the case is entirely different. The right of this plaintiff existed before Dr. Badger's death and before his conveyance to Rich. Her right of action was then precisely the same that it is now. She could have maintained her action then as well as now, but it must then have been against Dr. Badger. Whatever right Dr. Badger had to withhold the property from her he has conveyed to Mr. Rich, and Mr. Rich now represents him in that controversy. This precise point was decided in *Kroh v. Heins,* 48 Neb. 691. This claim existed between another person and the deceased prior to his death, and this is the test applied in *McCoy v. Conrad, supra.* It follows that Mr. Rich, the adverse party, is "the representative of a deceased person." The evidence of Mr. Holladay cannot therefore be considered.

The evidence shows that the plaintiff's husband had a farm of 320 acres in Valley county, and that many years ago he transferred this farm to his wife, and that Dr. Badger had the benefit of the use of this farm and the rentals thereof for some 15 or 16 years. One witness testified that the rentals amounted to at least $250 a year, and we have not observed that this evidence was contradicted. There is also evidence tending to prove that the plaintiff many years ago received a legacy of $300, and that this was turned over to Dr. Badger, and also that the plaintiff earned money in school-teaching many years, which was used by the family; and that the plaintiff became the owner of a house and lot which was sold by Dr. Badger and a large part of the proceeds used by him. There is also evidence tending to show that Dr. Badger's wife, the plaintiff's step-mother, had a farm adjoining the land in dispute, known as the "Weaver farm," and that the plaintiff at the solicitation of Dr. Badger exchanged

a quarter section of her land for the Weaver farm. One witness testified that the land so exchanged by the plaintiff was much more valuable than the Weaver farm. He estimated that the difference in the value was at least $1,300, and there is evidence tending to show that Dr. Badger at that time represented to the plaintiff that, as the farm in dispute was her farm, the Weaver farm would be much more valuable to her because it adjoined the land in dispute, and that the two tracts together would be a valuable farm, and that it was upon this consideration that the plaintiff consented to make the exchange, relying upon the promise to convey this land in question to her. Mrs. Badger was a witness in behalf of the defendants, and testified to this exchange. She made no denial of the plaintiff's contention that the exchange was made upon the representation and promise that the land in dispute should be conveyed to the plaintiff. It will be seen from the above that the evidence tends to show that Dr. Badger received from the plaintiff at least $4,000 or $5,000; and, while the defendants called and examined witnesses who must have known at least some of the circumstances showing such a consideration for the promise relied upon by the plaintiff, there is no evidence contradicting the evidence produced by the plaintiff upon that branch of the case, nor any evidence tending to show that Dr. Badger rendered to the plaintiff any other consideration than the land in question.

It is alleged that Dr. Badger some time before his death was addicted to the use of narcotics, and was for that reason incapable of transacting business. This allegation is not sustained by the evidence. He was, however, more than 80 years of age. Mrs. Badger, as a witness for the defendants, testified in regard to his physical and mental condition at the time and prior to the transfer of the land to the defendant Rich, and afterwards several letters written by Mrs. Badger were offered and received in evidence without objection. In one of these letters, under date of March 15, 1903, she said: "You have no idea how feeble

and forgetful he (Dr. Badger) is, and it worries him so much. Says I will have to help him about the farm, etc., but when he is out of hearing and trying to do business I cannot be of much help as he is liable to forget before he gets into the house. * * * He is not fit to do business of any kind and he feels it, the Meyers boys left the farms in very bad shape." In another letter, under date of March 30, 1904, she said: "Unless people are perfectly honest they have all the chance in the world to take advantage of him for he takes their say-so about everything as he knows he cannot keep straight in his own mind. He so often asks me about business matters that he has done that I know nothing about, for I did not at the time, and he can't remember what he has done." He seems to have had great confidence in the plaintiff and her husband for many years, and was very anxious to have them live in his neighborhood. At one time it was understood that they would do so, but for some reason this plan was changed. The defendants contend that it was upon this condition that Dr. Badger was to convey this farm in question to the plaintiff, and there is some evidence to indicate that Dr. Badger so understood it. Several witnesses testified that Dr. Badger frequently said that this plaintiff was to have his farm after his death. This language is consistent with the idea that he intended to give her the farm at some future time as a gift. It is also consistent with the idea that the farm was regarded as hers, and that he expected to use it as he did her other land as long as he lived. Several witnesses testify positively that he frequently said that this was the plaintiff's farm, and that he was attending to it and fixing it up for her.

The plaintiff's husband frequently acted for her in regard to her property and interests, and defendants introduced in evidence a letter written by him to Dr. Badger under date of April 25, 1905, which was soon after the land in question was conveyed to the defendant Rich. In this letter he said: "I am more than sorry to learn that

you have sold your farm.   Had I known that you wanted to sell, I would have bought it."   The defendants rely upon this letter as an admission that the farm belonged to Dr. Badger; but the letter as a whole strongly indicates that the writer, at least, believed that the plaintiff and himself had been greatly wronged by the conveyance of the land to Mr. Rich.   He also said in the letter:   "I would not have allowed that farm to have gone out of my hands during my life.   You know that the Weaver place is not good for much as it stands now, but what cannot be helped must be endured.   You was the promoter of that land trade, and persuaded me that that trade was just the thing for me to do, and that it would give me a good home all in a solid block.   I have been an easy mark for more than one.   I left everything in your hands; you have done as you wanted with it; so all is well that ends well.   I will drop the subject, as it is probably not particularly interesting to you."   He considered that, until Dr. Badger had deeded the land away, it belonged to himself and his wife, but by Dr. Badger's deed it had gone out of his hands. He and his wife had no title of record, and that he should suppose that the deed to a third party would be an effectual bar to their rights, or at least that he should not then have contemplated legal process to recover those rights, is not strange.   They contend that they had been induced to exchange for the "Weaver place" on the promise that the land in question, together with that place, would make a desirable farm, and he suggested to Dr. Badger that the "Weaver place is not good for much as it stands now." He upbraids him with being the promoter of that trade, and having "persuaded me that that trade was just the thing for me to do, and that it would give me a good home all in a solid block."   This language is wholly unintelligible, upon any evidence in this case, unless Mr. Badger had induced the trade for the "Weaver place" upon the promise and understanding that the land in question should be conveyed to this plaintiff.   The writer then says that he has been an easy mark for more than one, and fol-

lows it up with the statement that would have no meaning, unless it was a direct accusation that he had been an easy mark for Dr. Badger. The remark that the subject is probably not particularly interesting to Dr. Badger insinuates strongly that Dr. Badger must know that he had violated the contract.

The plaintiff was not allowed to testify, but there is evidence tending to prove that Dr. Badger executed a deed conveying this land to the plaintiff and delivered the deed to her, and afterwards upon the representation that he desired that the deed should name the plaintiff's husband also as grantee, and perhaps other representations, procured the deed from the plaintiff to make such changes, and failed to return it. There is evidence indicating that this deed still remained among Dr. Badger's papers after his death, and was destroyed by interested parties. Afterwards Dr. Badger executed a conveyance that is called a lease. It provided that the plaintiff and her husband should have the land in question as long as Dr. and Mrs. Badger lived, and should furnish them the necessaries for their support, and after their death should have the land absolutely. Still later the plaintiff and her husband executed an instrument for the purpose of canceling this so-called lease. It is a quitclaim of "all our interest, claim and demand in and to the certain leasehold interest heretofore made." It does not purport to quitclaim the land itself, but contains a clause granting Mr. Badger "full power and authority to deal with said above described property as they may deem proper." As Dr. Badger had been using all the lands of all the parties as he deemed proper, this last clause must be construed in the light of that fact. The evidence in regard to the execution and delivery of the deed is perhaps not so definite and conclusive as to establish that fact, but the clause in the so-called lease subsequently made, that after the death of Dr. and Mrs. Badger the plaintiff and her husband "shall come into full and immediate possession of said property, and this lease put on record shall be to the said Holla-

days a full and complete title to said property free and clear from all incumbrance of every form and kind," is consistent with the contention that the land was promised and conceded to be the property of the plaintiff. If the deed was executed and delivered, as contended by the plaintiff, and returned to Dr. Badger for correction, it may be that Dr. Badger intended this instrument, which he calls the lease, as equivalent of the deed which he had formerly executed. The plaintiff and her husband appear to have been very generous with Dr. and Mrs. Badger, and to have acquiesced in everything and anything that Dr. Badger saw fit to do with, not only his own property, but with their property also.

There is some claim put forth in the briefs that the defendant Milton College is an innocent purchaser of the notes, so that its title cannot be questioned. The evidence shows beyond a question that the notes were a pure donation to the college, and were so received and understood by all parties. The agreement to pay interest during the lifetime of Dr. and Mrs. Badger, or either of them, constitutes no consideration for the notes, as it merely amounts to allowing them the interest that was to be paid by the maker of the notes, the college taking the principal and the interest after the time limited. Mr. Rich was well acquainted with the land and existing conditions, and cannot, of course, claim to be an innocent purchaser; even if he were, he had not made payment at the time this action was begun, and therefore could not be an innocent purchaser as to such payments as he might make after notice. There is no doubt of the good faith of the college and its officers, and it would appear that to aid such an institution is a worthy object. Dr. Badger is not to be criticised for his desire to advance Christian education. In his age and infirmity he forgot his obligation to this plaintiff, and perhaps mistakenly supposed that because she had no title that she could place on record, and he himself had the legal title of record, he could withdraw his promise and dispose of the land as he thought best under all circumstances.

The evidence is in some respects complicated, and perhaps somewhat inconsistent, but we think that, taken as a whole, the proof shows that this plaintiff has fully paid for this land, and that, in consideration thereof, Dr. Badger considered this land to belong to the plaintiff and promised to convey it to her as alleged.

The judgment heretofore entered in this court is adhered to.

JUDGMENT ACCORDINGLY.

LETTON, J., not sitting.

ROSE, J., dissenting.

The evidence outlined in the opinion of the majority is, in my judgment, insufficient to justify the decree pronounced. I think the judgment of the district court should be affirmed. I am therefore compelled to adhere to my former dissent.

HAMER, J., dissenting in part, and concurring in the conclusion.

I concur in the conclusion that the court should adhere to the judgment heretofore rendered.

1. While the cogent argument contained in the majority opinion is strong, it appears to me that it might be still stronger and absolutely conclusive if it contained all of the material facts in the case, some of which, no doubt, are left out by inadvertence.

2. I am not satisfied that William J. Holladay, the plaintiff's husband, was disqualified to testify as a witness under section 329 of the code. I therefore dissent from so much of the opinion as holds that he was disqualified. Under the present decedent law, the plaintiff's husband had no direct legal interest in the result of the action, as the contingency by which he might possibly become entitled to the use of the land, or have an heirship in it, had not arrived. His wife was then living. And there is a waiver of the protection offered by section 329

because of the introduction of witnesses by the defense who testified as to the transaction and as to what was said by the neighbors and by Dr. Badger himself. When the defendant shows part of the transaction, the whole may be ▸shown by the plaintiff. *American Savings Bank v. Harrington,* 34 Neb. 598; *Parrish v. McNeal,* 36 Neb. 727; *Bangs v. Gray,* 60 Neb. 457. See, also, *Dodd v. Skelton,* 2 Neb. (Unof.) 475; *McCoy v. Conrad,* 64 Neb. 150; *Williams v. Miles,* 68 Neb. 463. As the effect of the section, if given a literal interpretation, is to cut the court off from the evidence showing the facts, the rule should not be applied unless it is strictly required by a reasonable interpretation. In *Parker v. Wells,* 68 Neb. 647, it was held that a wife might testify in favor of her husband in relation to conversations and transactions had with a person since deceased in all cases, except where the result of the suit, if favorable to the husband, would invest her with some direct legal interest in the subject of the controversy, and it was held that a dower interest did not disqualify her. This rule is seemingly analogous to that which ought to be in force in the present case.

3. I dissent from so much of the opinion as finds that Dr. Badger was not using a narcotic. One witness, Oscar Babcock, saw him every day, and testified that the doctor told him he could not keep up without medicine, and that the doctor said to him: "I can't leave it alone, I can't live without it." He also said that he used the purest article that he could get; that he did not buy it in town; that he could get a better article by sending away for it; that he bought $4 worth at one time; that he said: "I can't keep up without it." A number of witnesses testified that he failed to recognize his nearest neighbors; that he would meet them and say "I don't know you"; that he got very bad physically; that he would say, "I can't call your name," and then, when the man told him his name, he would not be able to place him; that he gradually became weaker, and at times was seemingly unconscious of his surroundings; that he imagined there was something

the matter with the chimney when there was nothing the matter with it; that he gave away his library, and wanted to give away his household goods and furniture; that he gave the preacher, M. B. Kelly, his horse and buggy; that he seemed dazed, and would commence to run, and that he would then catch hold of a telephone pole near his house to prevent himself from falling; and, in the language of Mary B. S. Badger, he became very nervous and forgetful, and was unable to remember "while he was turning around." In another letter she describes the doctor as "not fit to do business of any kind." And again "I can see his memory fail every day. * * * There is no question but what his brain is bad and heart also." It is apparent that he used something that was expensive. It was a drug that he sent away to get. He said that he could not keep up without it. The evidence seems to justify a finding that it was a narcotic.

4. I dissent from so much of the opinion as fails to find that the deed to William Henry Rich and the donation of the notes and mortgage to the college were obtained by the undue influence of William Henry Rich, Mary B. S. Badger, and M. B. Kelly, the preacher.

Dr. Badger was frail, and his mental power was much reduced by illness and old age. He was frequently ill, and he was beyond 80. The step-mother of the plaintiff had a direct interest in the conveyance of the land to Rich and the donation to the college. She became a beneficiary by that transaction, because after her husband's death she was to receive the interest. In view of the doctor's weak condition, his probable habits as to the narcotic, and with these strong and designing people around him, there was plenty of evidence, as it seems to me, to fully justify the conclusion of undue influence. At the time of the execution and delivery of the deed to the defendant Rich, Dr. Badger was extremely feeble, very infirm in his body, and hazy and uncertain in his mind, and also at the time that he delivered the notes and mortgage to the defendant Milton College, through M. B. Kelley, the traveling preacher.

Kelly wrote to the president of Milton College: "You will doubtless be agreeably surprised to find it (the donation) $8,000 instead of $5,000." He wrote the president at another time: "Hoping this will all be satisfactory to you and rejoicing in the privilege of bearing even a very *small part* in this *worthy transaction,* I remain very sincerely yours, M. B. Kelly." When examined about the matter of the donation, he said: "This correspondence with Milton College in reference to acceptance of this donation and what they would do *nearly all transpired through me."* Kelly seems to have been there when the notes and mortgage were made to Milton College. When he had received the notes and mortgage, *he sent them to the college.*. He was proud of what he did. Milton College gave nothing for the mortgage and notes except a guaranty that the interest would be paid, and, of course, if Rich paid the interest, as he promised in the notes that he would, then the college would be out nothing. William Henry Rich knew Dr. Badger, and was farming the land. He was helping to keep the plaintiff from coming into her own. While he was not called as a witness, his deposition was taken in support of plaintiff's motion for a new trial, and in that deposition he describes the execution of the deed to himself at Dr. Badger's house, and the delivery to the doctor of the mortgage. At that time Rich testified that the doctor had told him that he had given the Holladays a deed, and that he had written to have it sent back. He therefore knew that the deed had been delivered, and whether that fact appeared from the deposition or from testimony taken at the trial proper was immaterial, as it was one of the things properly before the court to be considered by it. Rich knew that he was a party to this questionable transaction. Mary B. S. Badger and M. B. Kelly each knew the transaction was questionable.

Of course, it is always a worthy object to aid a school or college, but I believe the blame should be placed where it belongs. Mary B. S. Badger, the step-mother, William Henry Rich, who received the deed for the land and who

made the notes and mortgage, and M. B. Kelly were all in it, and they are all responsible for the wrong done, while the college is merely called upon to give up something for which it paid nothing. Mary B. S. Badger, the step-mother, William Henry Rich, the purchaser of the farm, and M. B. Kelly were all interested in persuading this frail old man to forget his daughter and his duty. I have not observed anything said in the majority opinion touching the father's statements, made from time to time to the neighbors, that the improvements on the farm were for the daughter, or that he joined her name with his as one of the lessors of the land in crops. At least three witnesses describe these improvements, and what the father said about everything being for his daughter Kate (Mrs. Holladay). I have not observed that anything is said in the opinion about the daughter (Mrs. Holladay) going home from Kansas City to North Loup in August, 1904, to take possession of the farm, as she had agreed to do, and when she got there finding that her father claimed that he had rented the farm the day before to the defendant Rich. Mrs. Holladay then had her daughter with her when she went up there ready to go ahead with the arrangement made to farm the land and take care of the old folks; but, as they could not get possession of the land, they went back to Kansas City. The step-mother, Mary B. S. Badger, and the defendant Rich were active in this. The omitted facts show undue influence. There can be no doubt about it under the law. *In re Estate of Paisley*, 91 Neb. 139; *In re Estate of Frederick*, 83 Neb. 318, 321; *Orchardson v. Cofield*, 171 Ill. 14, 40 L. R. A. 256, 63 Am. St. Rep. 211.

I refer to the former opinion of this court (*Holladay v. Rich*, 92 Neb. 91), because it contains a fuller and more complete discussion of the facts than I am able to give in this brief review.